**UNITED STATES of America**

v.

**Lamont S. CARTER, Appellant.**

**UNITED STATES of America**

v.

**Jerome R. PATTERSON, Appellant.**

**UNITED STATES of America**

v.

**Jerome R. PATTERSON.**

**Nos. 73–1922, 73–2057 and 74–1473.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 22, 1974.

Judgment June 30, 1975.

Opinion July 18, 1975.

---

Deborah Jennings Nalls,* with whom Frank F. Flegal, Washington, D. C. (appointed by this Court), and Marsha A. Papanek,* were on the brief for appellant Lamont S. Carter.

Peter P. Broderick, with whom Larry J. Ritchie, Washington, D. C. (both appointed by this Court), was on the brief for appellant Jerome R. Patterson.

E. Lawrence Barcella, Jr., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and John O. Clarke, Jr., Asst. U. S. Attys., were on the brief for appellee. Harold H. Titus, Jr., U. S. Atty. at the time the record was filed, also entered an appearance for appellee.

* Entered an appearance as student counsel, pursuant to the General Rules of this Court.

** Sitting by designation pursuant to 28 U.S.C. § 292(d).

Before BAZELON, Chief Judge, DANAHER, Senior Circuit Judge, and JUSTICE,** United States District Judge for the Eastern District of Texas.

Opinion for the Court filed by District Judge JUSTICE.

Opinion filed by Senior Circuit Judge DANAHER, dissenting from reversal of the conviction of Carter.

JUSTICE, District Judge.

## I. INTRODUCTION

### A. *The Burglary*

In the early morning hours of June 29, 1971, security personnel at the Troop Command supply area of the Walter Reed Army Medical Center in Washington, D. C., discovered that the arms room of the facility had been forcibly entered. A window had been broken, a protective screen removed, and locks cut. A military police squad leader noticed two automobiles in a nearby parking lot, immediately before being notified of the break-in. He described one automobile as an intermediate sized, dark-colored, late 1960's vehicle. In this automobile, he observed one black male.[1] The other automobile was smaller than the first. Another military officer testified that the vehicles left the parking lot at a "rapid rate of speed." He described the lead automobile as large, "approximately in the Pontiac class"; the second automobile he saw was smaller, possibly a Mustang, Comet, or Falcon. This witness, Warrant Officer William Cherry, stated that he noticed the silhouettes of one person in the large automobile and two in the smaller vehicle.

The evidence revealed that fifteen M–14 rifles were missing from the arms room. Also gone were ten shotguns, one .22 calibre revolver, five M–17 gas masks, and a quantity of M–14 magazine clips, rifle cleaning equipment, and M–14 instruction manuals.

1. All of the appellants are black.

The arms room is located in a large projection of Building 63 of the Walter Reed facility. The projection is bisected by a hall, one end of which operates as an entrance to the building. On one side of the hall, the arms room and a storage room are adjacent to each other, the arms room abutting the entrance. These two rooms are of equal depth.

A large room, known as the linen exchange area, is contiguous to the storage room. The hall passing in front of the arms room and storage room leads into an open area in the linen exchange area, which serves as a passageway across this end of the room; the hall resumes at the end of the passageway. At the other end of the linen exchange area, two doors, opening to the outside, are set opposite each other in the side walls of the room. The linen exchange area equals the combined width of the arms room and storage room and is half again as deep as these two rooms, as measured from the hall and passageway. None of these rooms are connected with the others except by the hall.

In the linen exchange area, three long tables, parallel to each other but apparently separated by several feet, extend perpendicular to the hall and passageway. A wine bottle full of gasoline, with a wick—a partially scorched rag—protruding from the top, was discovered in the space between the two tables nearest the storage room, approximately even with the two outside doors. The device fits the description of a "Molotov

cocktail", as defined in the District of Columbia Code.[2]

A laundry room is situated in Building 63B, which is near Building 63. This room, called a "washateria", was generally open around the clock before the burglary. An inspection of the area near the washateria turned up a large bolt cutter and a crowbar.

The various charges of which appellants stand convicted were the outgrowth of these events.

## B. *Identity of the Appellants*

Multi-count indictments were returned against the appellants, Marzell Peterson, Lamont S. Carter, and Jerome R. Patterson, in 1972. A superseding indictment charged them with a variety of offenses under the District of Columbia and United States Codes. In May of 1973, all three appellants were brought to trial; the conspiracy count of the indictment had been severed. Appellant Carter was convicted of second degree burglary while armed,[3] theft of government property,[4] arson,[5] and possession of a Molotov cocktail;[6] he was sentenced to serve five to fifteen years in prison. Appellant Peterson, who was found guilty of one count of receiving and concealing government property,[7] was sentenced to a term of ten years.[8] Appellant Patterson was the only one of the three as to whom the jury could not reach a verdict. On June 27, 1973, having been re-tried, Patterson was convicted of conspiracy to receive and conceal government property,[9] but acquitted as to the five substan-

---

2. 22 D.C.Code § 3215a provides, in pertinent part:

> [T]he term "molotov cocktail" means (1) a breakable container containing flammable liquid and having a wick or a similar device capable of being ignited, or (2) any other device designed to explode or produce uncontained combustion upon impact; but such term does not include a device lawfully and commercially manufactured primarily for the purpose of illumination, construction work, or other lawful purpose.

3. 22 D.C.Code §§ 1801(b), 3202.

4. 18 U.S.C. § 641.

5. 22 D.C.Code § 401.

6. 22 D.C.Code § 3215a.

7. 18 U.S.C. § 641.

8. This term of imprisonment was to run concurrently with sentences of three to ten years and ten years to life which had been imposed for convictions on counts of assault with intent to kill while armed and assault on a police officer while armed. These convictions, affirmed by this court on April 18, 1974 (No. 73–1105), stem from an incident related to this appeal. This incident is referred to in discussion of the "hot pursuit" search and seizure of which appellant Peterson complains, and which is treated in Judge Danaher's opinion.

9. 18 U.S.C. § 371.

tive counts of the indictment. He was sentenced to serve a term of from one to five years. An appeal is taken from each of these convictions. The contentions of appellant Peterson are treated in a separate opinion by Judge Danaher in United States v. Peterson, 173 U.S. App.D.C. ——, 522 F.2d 661 (1975).

## II. APPELLANT PATTERSON

Appellant Patterson urges four points of error in this appeal, two of which we find to be meritorious. The first issue for consideration pertains to the admissibility of certain evidence seized during a search of his residence.

### A. *The Search and Seizure*

Armed with a warrant for the arrest of appellant Patterson, special agents of the Federal Bureau of Investigation arrived at 4033 Ely Place, S. E., the appellant's home, on the morning of August 10, 1972, at about 9:00 o'clock. They had no search warrant for this residence.

Special Agent Thomas Dowd posted himself outside the rear of the premises; other special agents entered through the front door and arrested Patterson near the front of the house. While appellant Patterson was being placed under arrest, another special agent admitted Dowd, through the back door, into the kitchen area of a shed that was attached to the house. Once inside, Dowd immediately went through the kitchen area to an open doorway, which was the entrance to a narrow flight of makeshift stairs. After ascending the stairs, he came into an open attic. There, he observed a pile of shopping bags, cardboard boxes, blankets and luggage on the floor of the attic near a corner. Dowd testified that he feared a sniper was hiding behind the

pile, and that he approached it with caution. Testifying further, Dowd stated that, in order to reach the corner, he found it necessary to move an open, two-handed shopping bag; in the process of moving the bag, he glanced down and observed a quantity of M–17 military gas masks, M–14 ammunition clips, and a white pouch with "military type" writing on it. (The pouch was later found to contain five gun cleaning kits.) Dowd did not find anyone behind the pile. The other special agents likewise failed to discover anyone in the house, aside from appellant Patterson.

After making an inventory of the items found in the attic, the special agents obtained a search warrant. It was based, in significant part, on information gained from this initial search.[10] After being informed that the warrant had been issued, the special agents left appellant's home with the seized items. Nothing else was seized during subsequent searches of the premises.

The court below initially granted appellant Patterson's motion to suppress the items seized as a result of the warrantless search, finding that the search exceeded the permissible scope of a "search incident to an arrest" delineated under the doctrine of Chimel v. California.[11] The trial judge's comments in the record make it clear that, in so ruling, he did not find that Special Agent Dowd was without authority to enter the attic; rather, the trial judge determined that Dowd's actions, once in the attic, were outside the bounds prescribed by *Chimel.* After reconsideration of the motion to suppress, the trial judge reversed his previous ruling, based on the holding in United States v. Wright,[12] and the seized items were admitted into evidence

---

10. This search warrant does not affect the admissibility of the evidence, for a search cannot be justified by the evidence it produces. United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *cf.* Johnson v. United States, 333 U.S. 10, 15–17, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

11. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

12. 146 U.S.App.D.C. 126, 449 F.2d 1355 (1971), cert. denied, 405 U.S. 947, 92 S.Ct. 986, 30 L.Ed.2d 817 (1972). *Wright* discussed the so-called "challenging situation" and "plain view" doctrines as justifications for police conduct under certain circumstances.

against appellant Patterson. While we are troubled, as was the trial judge, with the scope of the attic search and with application of the "plain view" doctrine to this set of facts, we need not reach this issue, for we disagree, in the first instance, with his finding that Special Agent Dowd was justified in entering the attic without benefit of a valid search warrant.

■ The Fourth Amendment's mandate of "probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the . . . things to be seized" contemplates that, before a search warrant may be issued, a determination be made by a neutral and detached magistrate of whether these requirements have been met.[13] As the Supreme Court said in McDonald v. United States:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.[14]

Thus, the Supreme Court has held that a warrantless search of a dwelling is *per se* unreasonable, even if the officers' have probable cause to conduct it, in the absence of the exigent circumstances referred to in *McDonald*.[15] And in each of those few instances where the Court has countenanced searches without a warrant, the majority has argued that the result is not inconsistent with the purposes and values which lead to the adoption of the fourth amendment. Indeed, it has been only after exhaustive analyses and frequent dissents that the Court has sanctioned certain warrantless searches as being reasonable under the amendment; these include consent searches,[16] searches incident to an arrest,[17] searches concomitant to the "hot pursuit" of a felon,[18] emergency searches for the protection of an arresting officer,[19] and searches to prevent the imminent destruction or removal of evidence.[20]

---

**13.** The full text of the Fourth Amendment is as follows:

The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

See United States v. U. S. District Court, 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Johnson v. United States, supra, 333 U.S. at 13–14, 68 S.Ct. 367; Aguilar v. Texas, 378 U.S. 108, 110–111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

**14.** 335 U.S. 451, 455–456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).

**15.** *See* Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

**16.** Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); cf. Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946).

**17.** Chimel v. California, supra.

**18.** Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

**19.** *E. g.*, Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

**20.** *E. g.*, Schmerber v. California, 384 U.S. 757, 770–771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).

In the case before this court, probable cause for the issuance of a warrant to search appellant Patterson's home might well have been found by a magistrate, since Patterson had been indicted for theft of government property, and the F.B.I. was in receipt of information that he had obtained possession of one of the stolen weapons.[21] In the face of this, there was no allegation, and the facts would not support a contention, that it was impractical to obtain a search warrant prior to the arrest of appellant Patterson.[22] Moreover, the government does not contend that he gave permission for the search.

 Since the legitimacy of the warrant for appellant Patterson's arrest has not been disputed, the question for determination is whether the search was proper as a "search incident to a valid arrest". With respect to this issue, the *Chimel* rubric must be considered: an arresting officer may search the arrestee's person to discover and remove weapons and to seize evidence to prevent its concealment or destruction, and may search the area within the immediate control of the person arrested, "construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."[23] However, "[t]here is no comparable justification . . . for routinely searching any room other than that in which an arrest occurs."[24] Clearly, at the time of his arrest, the attic was not within appellant Patterson's immediate control, and the government has not contended that the F.B.I. was in receipt of information to support a conclusion that any contraband evidence in the house was in danger of destruction or removal from the jurisdiction. It follows that the search of the attic cannot be defended as one incident to an arrest.

The government, however, argues that Special Agent Dowd was legally justified in entering the attic, and that his subsequent seizure of contraband was legitimate under the "plain view" doctrine. In considering the circumstances of this seizure in the context of "plain view" analysis, it is of consequence that we heed the warning of the Supreme Court in Coolidge v. New Hampshire that "to permit warrantless plain-view seizures without limit would be to undo much of what was decided in *Chimel* . . . ."[25] The court further cautioned:

[I]t is [also] important to keep in mind that, in the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

\* \* \* \* \* \*

What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused.[26]

Consequently, as to the "plain view" doctrine, the threshold question is whether Special Agent Dowd's ingression into the attic was proper under applicable standards.

A dual justification is asserted by the government. On the one hand, it suggests that the search was maintainable because there were warrants outstanding

**21.** *See* Aguilar v. Texas, supra; Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

**22.** *Cf.* Vale v. Louisiana, 399 U.S. 30, 35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); Ker v. California, 374 U.S. 23, 42, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); McDonald v. United States, 335 U.S. 451, 454–455, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); *Johnson v. United States, supra.*

**23.** 395 U.S. at 763, 89 S.Ct. at 2040.

**24.** *Id.*

**25.** 403 U.S. 443, 482, 91 S.Ct. 2022, 2046, 29 L.Ed.2d 564 (1971).

**26.** *Id.* at 465, 466, 91 S.Ct. at 2037.

against those of appellant Patterson's co-indictees who were fugitives. The second rationale is that Dowd had a right to conduct a "protective" search of the attic, in order to insure the safety of the F.B.I. agents at the scene.

■ As to the contention that the special agents were merely seeking to execute outstanding arrest warrants, it is significant that this search took place more than a year after the burglary. It was also conceded by the government that the special agents who conducted the search had no factual information that indicated the presence of the fugitives at appellant Patterson's residence; in fact, one special agent acknowledged that the F.B.I. did not have information as to whether the fugitives were in the Washington, D.C., area, or even if they were still in the United States. Nevertheless, it is this set of circumstances—which we find to be entirely deficient—that the government urges as warranting a search of the entire premises.[27]

■ We next turn to the government's contention that the search was necessary to protect the safety of the officers involved. In this connection, evidence was submitted that the special agents were informed prior to the search that appellant Patterson had been involved in a burglary in which military weapons were stolen, and was an associate of Marzell Peterson and one Joseph D. Gantt, both of whom had been involved in a "shootout" with police. Following the "shootout", these individuals were arrested and charged; but we have found nothing in the record to disclose what information the special agents possessed as to the whereabouts of Peterson and Gantt at the time of the search in issue here. In further support of the government's argument, it was shown that the special agents were aware that a number of the stolen weapons had not been recovered and that warrants of arrest were outstanding for other suspects in the burglary investigation, who had been declared to be in a fugitive status by the F.B.I. shortly before the search. In addition, Special Agent Dowd testified that, before his entry into the house, he observed that the attic window would be a good place for a sniper to position himself. All of the special agents admitted, however, that they saw no movement behind the window and heard no voices from the attic.

These circumstances, whether considered singly or collectively, do not present sufficient justification for a "protective" search of the entire house; for a rule that permitted a warrantless residence-wide search in any instance where an arresting officer hypothesized the presence of armed felons and noticed a potential vantage for a sniper might very well abolish the *Chimel* doctrine for all but plate glass houses.[28]

27. While the government's theory is that the special agents were looking for people, and most of the testimony is consistent with this proposition, at one point Agent Dowd was asked, "What happened when you got up in the attic?" His answer: "When I got up in the attic, I searched for evidence up there."

28. The grounds for a "protective" search here asserted are similar to those rejected by the Court of Appeals for the Seventh Circuit in United States v. Gamble, 473 F.2d 1274 (7th Cir. 1973). Precisely as in the instant case, the officers in *Gamble* possessed an arrest warrant, but not a search warrant. The factors advanced in *Gamble* as exigent circumstances, sufficient to permit a warrantless search, were as follows:

1. The police upon numerous occasions had responded to calls of "shots-fired" at defendant's address.

2. The outside of defendant's house resembled an embattled fortress;
 (a) the front door was boarded up due to a recent explosion, and
 (b) there were numerous bullet holes in the outside walls.

3. There had been a large gathering of 20–30 persons at defendant's house earlier in the day.

4. The defendant was accused of a violent crime involving a dangerous weapon.

5. The defendant was known to possess firearms, admitted to owning a handgun, and expressed a particular interest in automatic weapons.

6. The police heard "rustling" noises from inside defendant's house after announcing their office and purpose. *Id.* at 1277.

In its convincing opinion, the Seventh Circuit, declining "to establish a new exception to the

██ The government, in seeking to uphold its contention that Special Agent Dowd was justified in entering the attic, also relies upon United States v. Miller, and, in particular, the following quotation:

> Although the man they sought was in view from the moment the door was opened, they had no way of knowing who else might be on the premises. In those circumstances, the police could justifiably conduct a search of the suite to assure themselves that no hostile and possibly dangerous persons were hiding in the other room.[29]

Miller involved the search of a dentist's office following a liquor store robbery, and the court explicitly rested its affirmance of the tactics there employed on the "hot pursuit" doctrine of Warden v. Hayden.[30] In the instant situation, though, it is abundantly clear that the government has not demonstrated an immediacy or urgency of the character set out in Miller. In particular, it has not been established why there was opportunity for the special agents to procure a warrant for the arrest of appellant Patterson but not to obtain a warrant to search his home—that is, until after they had completed their search.

██ This court is not unsympathetic to the plight of law enforcement officers, who, in the course of their duties, all too often find themselves in dangerous and precarious situations. It is certainly their responsibility to employ such measures as are reasonably necessary to execute arrest warrants with safety to themselves and others, when it is possible to do so. However, officers of the law likewise have the duty, before undertaking a search, to heed the strictures and demands of the Fourth Amendment. To affirm the warrantless search in issue here would be to turn a deaf ear to the Coolidge admonition:

> The warrant requirement has been a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconvenience to be somehow "weighed" against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the "well-intentioned but mistakenly over-zealous executive officers" who are a part of any system of law enforcement.[31]

In summary, it has not been shown that the F.B.I. special agents were acting under a reasonable belief that persons for whom arrest warrants were outstanding might be located in appellant Patterson's residence. Neither has it been demonstrated that a search of the attic in this house was necessary to effectuate the safe execution of the arrest warrant. Further, the items seized during the warrantless search of August 10, 1972, were plainly not within the area within which appellant Patterson could have gained possession of a weapon or destructible evidence. It follows that the intrusion of Special Agent Dowd into appellant's attic was unreasonable under the Fourth Amendment; the items

fourth amendment requirement of a warrant", held that the police's "protective sweep" was an unjustifiable intrusion. Id. The supposed exigent circumstances in the case before us are of even less magnitude than those asserted in Gamble. Thus, we also repudiate the proposed exception. See also United States v. Erwin, 507 F.2d 937 (5th Cir. 1975); Enzensperger v. Solomon, Nos. 73–2407, 73–2383 (July 29, 1974, 9th Cir.) (unpublished), cert. denied, 420 U.S. 966, 95 S.Ct. 1361, 43 L.Ed.2d 445 (1975); People v. Giacalone, 24 Mich.App. 492, 180 N.W.2d 289 (1970). But see United States v. Looney, 481 F.2d 31 (5th Cir. 1973); United States v. Briddle, 436 F.2d 4 (8th Cir.

1970), cert. denied, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824.

**29.** 145 U.S.App.D.C. 312, 315, 449 F.2d 974, 977 (1970).

**30.** See also United States v. Harris, 140 U.S. App.D.C. 270, 435 F.2d 74 (1970), cert. denied 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152, where shortly after a robbery, police found two suspects in an apartment and had reason to believe a third suspect was hiding on the premises. The court upheld the search only because it determined that Chimel was not to be applied retroactively.

**31.** 403 U.S. at 481, 91 S.Ct. at 2046.

seized there were the fruits of the impermissible search, and their admission into evidence was error.

### B. *Co-conspirator in Prison Garb*

Appellant Patterson also complains that during the course of his second trial, appellant Carter, who had been convicted at the first trial, was brought into the courtroom (for purposes of identification) in what is termed "prison garb." The record does not reflect precisely what Carter was wearing, but it was apparently distinctive in appearance. Since Carter was named as a co-conspirator in the indictment read to the jury, appellant Patterson contends that his individual right to due process of law was prejudiced by the presentation of Carter before the jury in prison clothes.

The trial court instructed the jury that "a prior proceeding in this matter" involved appellants Lamont Carter and Marzell Peterson, but that the jurors were not to "guess or speculate or wonder in any way why Mr. Carter and Mr. Peterson are not before you today." The record discloses that Peterson and Carter were closely linked to appellant Patterson by the evidence. Appellant Patterson, therefore, maintains that there is a significant probability the jury reasoned that Carter, appearing in prison garb, had already been convicted "in this matter"; thus, it was likely that Patterson, his good friend and co-conspirator, was also guilty. This argument is not without merit.

Despite some authority to the contrary,[32] the majority view is that compelling a *defendant* to appear before a jury in his prison clothes unconstitutionally infringes his due process right to be presumed innocent until proved guilty.[33] The Court of Appeals for the Tenth Circuit, although holding that trial in prison garb is not *inherently* prejudicial, nevertheless reversed a conviction because of the taint created by the practice.[34] It would not be an illogical extension of these cases to apply the proscription against prison garb to the situation with which we are here faced.[35] In light of our reversal of appellant Patterson's conviction on other grounds, it is not necessary to characterize this occurrence as reversible error. Nonetheless, insofar as criminal actions are concerned, we condemn the practice of producing prisoners in court who are dressed in clothes typical of jails or penal institutions, when this circumstance may arguably cause injury to a defendant's case.

### III. APPELLANT CARTER

#### A. *Factual Issues*

Appellant Carter was convicted of theft of government property, possession of a Molotov cocktail, burglary while armed (with a Molotov cocktail), and arson.[36]

The most damaging evidence introduced against appellant Carter was the testimony of Harold Parker and Richard Arrindell, two of the residents of a house located at 1318 Farragut Street.[37] Parker testified that on the morning of June 29, 1971, at 2:00 or 3:00 o'clock, he was awakened by a third resident, Rob-

---

**32.** *See* Hall v. Cox, 324 F.Supp. 786 (W.D.Va. 1971); Xanthull v. Beto, 307 F.Supp. 903 (S.D. Tex.1970); McFalls v. Peyton, 270 F.Supp. 577 (W.D.Va.1967), aff'd 401 F.2d 890 (4th Cir. 1968), cert. denied 394 U.S. 951, 89 S.Ct. 1292, 22 L.Ed.2d 486 (1969).

**33.** *See, e. g.,* Bentley v. Crist, 469 F.2d 854 (9th Cir. 1972); Gaito v. Brierley, 485 F.2d 86 (3rd Cir. 1973); Hernandez v. Beto, 443 F.2d 634 (5th Cir. 1971), cert. denied 404 U.S. 897, 92 S.Ct. 201, 30 L.Ed.2d 174 (1971); Brooks v. Texas, 381 F.2d 619 (5th Cir. 1967); People v. Shaw, 381 Mich. 467, 164 N.W.2d 7 (1969); People v. Zapata, 220 Cal.App.2d 903, 34 Cal.

Rptr. 171 (1963), cert. denied 377 U.S. 406, 84 S.Ct. 1633, 12 L.Ed.2d 495 (1964).

**34.** Anderson v. Watt, 475 F.2d 881 (10th Cir. 1973). *See also* Watt v. Page, 452 F.2d 1174 (10th Cir. 1972).

**35.** The American Bar Ass'n Standards Relating to Trial by Jury at 93: "An incarcerated defendant or witness should not be required to appear in court in the distinctive attire of a prisoner or convict."

**36.** *See* notes 3–6.

**37.** These two individuals testified under promises of immunity from prosecution.

ert Marshall,[38] and went downstairs with him. There, he was introduced to appellants Carter and Patterson. The four proceeded to a light-blue Falcon automobile, which was parked in an outside alley,[39] and unloaded a number of bags from the vehicle. The bags were then placed in the seat of another automobile, located in a garage attached to the residence. It developed that weapons and gas masks were contained in the bags, although Parker professed to be unsure of their contents at the time of the unloading. Parker also testified that, during the subsequent few weeks, appellant Carter, generally accompanied by appellant Patterson, returned to the house at 1318 Farragut Street on several occasions. It was his further testimony that, in each instance, appellant Carter conversed privately with appellant Peterson and departed with a rolled-up blanket, which Parker believed to contain weapons.

Arrindell's testimony corroborated and supplemented that of Parker. He confirmed that appellant Carter came to visit the residents at 1318 Farragut Street several times and always left with an armload of M–14 rifles. These weapons, he testified, had been stored in the garage. They were seized during the subsequent search of the residence[40] and identified as being among those stolen from the Walter Reed arms room on June 29, 1971.[41]

Appellant Carter presented the defense of alibi at the trial of his case, taking the stand in his own behalf to refute the allegations of Parker and Arrindell. Both he and his inamorata, Lenette Cruz, testified that, from the evening of June 28, 1971, to the next morning, Carter was with her in her Washington apartment.

## B. *Trial Court's Instruction as to Permissible Inferences*

The trial judge, at the conclusion of the evidence, instructed the jurors that they were permitted to infer that appellant Carter was "guilty of the crimes charged", if they determined, beyond a reasonable doubt, that he was found in unexplained, exclusive possession of recently stolen property. Appellant Carter contends that this instruction was erroneous; he couples this contention with an allegation that his convictions were predicated on insufficient evidence.

Certain instructions respecting the permissible inferences that may arise from possession of recently stolen property have been approved by the Supreme Court. In Barnes v. United States,[42] the district court instructed the jury that "[p]ossession of recently stolen property, if not satisfactorily explained, is ordinarily a circumstance from which you may reasonably draw the inference and find, in the light of the surrounding circumstances shown by the evidence in the case, that the person in possession *knew the property had been stolen.*" (Italics added.) On review, the Supreme Court found that the inference satisfied the reasonable doubt standard; that is, the evidence necessary to invoke the inference was sufficient for a rational juror to find the inferred fact beyond a reasonable doubt. Accordingly, the court held that the instruction comported with the requirements of due process.

It is not disputed by appellant that, when the reasonable doubt test is satisfied, a jury also may infer that one found in exclusive possession of recently stolen property, unsatisfactorily explained, was the *perpetrator* of the

---

**38.** The fourth resident was Marzell Peterson.

**39.** It was in evidence that appellant Carter drove a blue Falcon.

**40.** The circumstances of this search are discussed in the companion opinion, United States v. Peterson, 173 U.S.App.D.C. ——, 522 F.2d 661.

**41.** Other evidence introduced against Carter included some "doodles" drawn by him; these drawings are the subject of discussion in a following section of this opinion.

**42.** 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973).

theft.[43] It is often noted that instructions such as these do no more than "accord the evidence its natural probative force"; that is, they are merely articulations of a reasoning process which the jury may legitimately employ to identify the person who committed an offense.[44] Appellant Carter, recognized the validity of the latter instruction in general, demurs to its application to the facts before us.

■ We agree with appellant Carter's contention that the vice in the instruction given by the trial court lay in its utilization of the words "guilty of the *crimes* charged." (Italics added.) While an inference of *theft* by a defendant may logically follow from the circumstance of his unexplained possession of recently stolen items, that same logic does not necessarily support extension of the inference to other offenses. For an inference to be valid under established principles of criminal law, the presumed fact must, beyond a reasonable doubt, flow from the proved facts on which the inference depends.[45]

■ Three of the counts against Carter were related, directly or indirectly, to the mere proximity of the Molotov cocktail to the scene of the burglary. These offenses were arson, possession of a Molotov cocktail, and second degree burglary while armed with a Molotov cocktail.[46] An essential element of the crime of arson is the burning or attempted burning of a building.[47] We have been directed to no authority for the proposition that this element may be inferred from a finding that a defendant is in possession of recently stolen property. On the contrary, to allow the jury to infer from Carter's possession of the recently stolen items that he attempted to burn the armory would "accord the evidence more than its natural probative force", *i. e.,* the attempted burning, the inferred fact, is not, beyond a reasonable doubt, a corollary of possession of recently stolen property, the fact proved. Similarly, the naked fact that Carter later possessed the stolen rifles would not, by itself, authorize a deduction by the jury that, beyond a reasonable doubt, he had or was "armed with" the Molotov cocktail at the time of the burglary.[48] The trial court's

43. Such instructions have been approved by this court in other instances, *e. g.,* United States v. Johnson, 140 U.S.App.D.C. 54, 433 F.2d 1160 (1970); Pendergrast v. United States, 135 U.S.App.D.C. 20, 30, 416 F.2d 776, 787 (1969), cert. denied 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969) and cases cited therein. Pendergrast offers a sample instruction, which sets out all requisites for its application.

44. McNamara v. Henkel, 226 U.S. 520, 525, 33 S.Ct. 146, 57 L.Ed. 330 (1913); Pendergrast v. United States, supra, 135 U.S.App.D.C. 31, 416 F.2d 787, 788.

45. Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969); *cf.* Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); United States v. Romano, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965). The majority in United States v. Johnson, supra, citing the above cases, comments that "[w]hat invalidates an inference or presumption on due process grounds is a 'lack of connection between' the proven and the inferred facts 'in common experience'—the lack of a 'reasonable relation to the circumstances of life as we know them . . .'" 140 U.S. App.D.C. 63, n. 69, 433 F.2d 1169, n. 69.

46. These offenses are defined in the following code sections: (1) arson (22 D.C.Code § 401); (2) possession of a Molotov cocktail (22 D.C. Code § 3215a); (3) second degree burglary while armed with a Molotov cocktail (22 D.C. Code §§ 1801(b), 3202).

47. 22 D.C.Code § 401 provides that:
 Whoever shall maliciously burn or attempt to burn any . . . house, . . . warehouse, or any other building, . . . the property in whole or in part, of another person, . . . or any of the public buildings in the District, belonging to the United States or to the District of Columbia, shall suffer imprisonment for not less than one year nor more than ten years.

48. If the instruction had not authorized an inference that the burglary was committed while appellant was armed, it may well have been proper for the offense of burglary. Second degree burglary, in this jurisdiction, entails the unlawful entering of a building with the intent to commit a criminal offense. We have found that Carter's unexplained exclusive possession of recently stolen property may properly be invoked to infer that he was the perpetrator of the theft, but not to infer that he was armed with a Molotov cocktail found in another

instruction, therefore, sanctioned inferences that the jury might not have felt to be warranted by the evidence, absent the instruction. As to the three counts which involve the Molotov cocktail, then, the instruction was erroneous.

### C. *Sufficiency of the Evidence*

Appellant Carter also insists that there was insufficient evidence to support conviction on the three counts which involve the Molotov cocktail. He moved for judgment of acquittal at the conclusion of the government's evidence in chief, and renewed the motion at the conclusion of all the evidence in the case. The motions having been overruled by the trial court, the issue of the sufficiency of the evidence to convict was thus properly preserved for appellate review. Upon careful consideration, we are compelled to agree that the evidence was insufficient to support appellant Carter's conviction, as to each of these three counts, without benefit of the impermissibly broad inference instruction.

The standard applicable to a motion for judgment of acquittal was examined in Curley v. United States:

> The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. *In a given case, particularly one of circumstantial evidence, that determination may depend upon the difference between pure speculation and legitimate inference from proven facts.* (Italics added.)[49]

In seeking to determine whether the jury's verdict was based upon "legitimate inference" or "pure speculation", we must keep in mind Judge Prettyman's observation: "[T]he minds in which a reasonable doubt, or its absence, must be established, are the minds of the jury."[50]

To recapitulate the evidence on this point of appeal, it was shown that the

room. The permissible inferences from the proven circumstances would seem to include unlawful entry and present intention to commit an offense, viz., theft. In Tot v. United States, supra, the Court, in articulating due process mandates for a statutory presumption stated that "[t]he jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference" 319 U.S. at 467, 63 S.Ct. at 1244. We have held that the connection between the inferred fact and the proved fact must meet the reasonable doubt standard, in order for the inference instruction to be permissible. United States v. Johnson, supra. On the basis of reason and experience, a reasonable jury could find beyond a reasonable doubt that one who has stolen property from a building that had been broken into, entered that building unlawfully with the intention to commit a theft. *Cf.* United States v. Fox, 140 U.S.App.D.C. 129, 433 F.2d 1235 (1970); United States v. Thomas, 144 U.S.App.D.C. 44, 444 F.2d 919, 924 (1971); Wood v. United States, 120 U.S.App.D.C. 163, 344 F.2d 548 (1965). In United States v. Melton, 160 U.S.App.D.C. 252, 254, 491 F.2d 45, 47 (1973), the defendant was shown to have unlawfully entered, but the court, finding no additional circumstance to sustain an inference of intent to commit a further offense, reversed his burglary conviction for insufficiency of the evidence. Here, the fact that Carter possessed the stolen property is the "further circumstance", missing in Melton, which supports the inference that Carter intended to commit an offense at the time of his entry. The jury was not required to form the inference, but to permit the jurors to do so would not violate the requisites of due process.

49. 81 U.S.App.D.C. 389, 391–392, 160 F.2d 229, 232–233, cert. denied 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

50. 81 U.S.App.D.C. at 395, 160 F.2d at 235.

arms room and the linen exchange area at Walter Reed are in close proximity to each other in Building 63 of the facility. On the morning of the burglary, at 12:20, Sergeant Dimech checked the arms room, as was his duty, and found it secure. Dimech discovered on his next round, at approximately 1:50 a. m., that the locks to the arms room had been cut. He immediately reported the break-in to the Provost Marshal's office, waited for Officer Cherry, and then returned to the arms room. Officer Cherry testified that he secured the arms room at about 2:15 a. m. At that particular time, the linen exchange area was not inspected by any of the military personnel. Officer Cherry recalled that, "[L]ater on in the evening I walked around the building again . . . [A]fter one of the criminal investigators had arrived . . . we decided it would be best to search the surrounding area . . . It had not been done yet." Estimating that he began this search at 3:15 a. m., Cherry further testified that he then found bolt cutters and a crowbar outside the washateria section of Building 63B. Shortly thereafter, he discovered the Molotov cocktail inside the linen exchange area.

As already set out, the device was located on the floor, between two long tables. A number of white hospital uniforms, upon which furniture polish had been sprayed, were also found on the floor of the area. There was testimony from a government witness that Building 63 was "secured" at 5:00 p. m. on the afternoon before the burglary. The witness explained the word "secured" as meaning that, after he ascertained that no one was left inside the building, he locked the outside doors and windows. He did not explicate his method of determining whether anyone was still in the building, i. e., whether by actual inspection, head count, closed circuit television,

or otherwise. It bears emphasis that the government failed to offer any evidence to establish that the Molotov cocktail was not in the linen exchange area at the time the building was "secured"; nor was there evidence that the room was examined by security personnel at any intervening time before the burglary.

 That these circumstances are highly suspicious is unquestionable. It is entirely conceivable that the perpetrators of the burglary also left the Molotov cocktail at the scene. But mere suspicion is not sufficient to warrant a conviction,[51] for, as noted in *Curley,* we are governed by a standard of proof beyond a reasonable doubt. The Supreme Court's pronouncement in In re Winship, articulates the fundamental nature of this standard:

> It is critical that the moral force of the common law not be diluted by a standard of proof that leaves people in doubt whether innocent men are condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.[52]

 We are required to view the evidence in the light most favorable to the government, to ascertain whether there is sufficient substantial proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom, from which the jury might find the defendant guilty beyond a reasonable doubt.[53] We begin our analysis with the permissible jury inference that appellant Carter was at the scene of the burglary and, indeed, was a perpetrator of the theft. This, the jury could have concluded from the fact of Carter's ex-

---

**51.** Bailey v. United States, 135 U.S.App.D.C. 95, 101, 416 F.2d 1110, 1116 (1969); Scott v. United States, 98 U.S.App.D.C. 105, 107, 232 F.2d 362, 364 (1956); United States v. Thomas, 453 F.2d 141, 143 (9th Cir. 1971), cert. denied sub nom. Lucas v. United States, 405 U.S. 1069, 92 S.Ct. 1516, 31 L.Ed.2d 801; United States v. Wright, 450 F.2d 992, 994 (10th Cir. 1971).

**52.** 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). (Brennan, J.).

**53.** Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

clusive possession of the recently stolen property. It is established, however, that the mere presence of an accused at the scene of a crime is not sufficient to establish his guilt.[54] In our examination of the record, we are met with a dearth of any other direct or circumstantial evidence linking the Molotov cocktail with Carter or either of the other appellants.

Upon this evidence, reasonable hypotheses may be advanced whereby appellant Carter would not have been involved in any of the offenses delineated in these three counts; indeed, for aught the record shows, the Molotov cocktail might have been in the exchange area at the time Building 63 was secured. But we are admonished in *Curley* that, "if the judge were to direct acquittal whenever in his opinion the evidence failed to exclude every hypothesis but that of guilt, he would preempt the functions of the jury."[55] Thus, we do not require that the evidence foreclose every conceivable premise inconsistent with guilt. Nevertheless, aside from the inference of the presence of appellant Carter and the other appellants at the scene of the burglary, there is a total absence of any evidence to connect him or the others with the weapon in question. We are constrained to conclude,

therefore, that the evidence was insufficient to have warranted the jury in finding, beyond a reasonable doubt, that Carter, in the words of the indictment, "did willfully and maliciously attempt to burn a warehouse", that he "did knowingly, willfully and unlawfully manufacture, use, possess and transport a Molotov cocktail", or that he "while armed with a Molotov cocktail did enter with intent to steal . . ." The jury verdicts on these counts having gone beyond the bounds of legitimate inference and into the realm of speculation and conjecture, the motion for judgments of acquittal, as to the offenses associated with the Molotov cocktail, should have been granted. Appellant Carter was, however, charged with second degree burglary, a lesser included offense of second degree burglary while armed. Since the evidentiary failure relating to this count concerns only the circumstance of appellant's being armed, re-trial of appellant Carter, which is mandated on other grounds, may include this lesser charge.[56]

Appellant Carter next contends that the instruction in question was not apposite to theft of government property, the remaining offense charged in the indictment, maintaining that the evi-

54. Hicks v. United States, 150 U.S. 442, 14 S.Ct. 144, 37 L.Ed. 1137 (1893); Bailey v. United States, supra at 98–99, 416 F.2d at 1113–1114; United States v. Kelton, 446 F.2d 669, 671 (8th Cir. 1971); United States v. Thomas, supra, 173 U.S.App.D.C. at p. ——, 522 F.2d at p. 681, 453 F.2d at 143; United States v. Wright, supra, 173 U.S.App.D.C. at p. ——, 522 F.2d at p. 681, 450 F.2d at 994; United States v. Holt, 427 F.2d 1114, 1117 (8th Cir. 1970); United States v. Garguilo, 310 F.2d 249, 252–254 (2nd Cir. 1962).

55. 81 U.S.App.D.C. at 393, 160 F.2d at 233.

56. Rule 31(c) of the Federal Rules of Criminal Procedure provides that a defendant may be found guilty of "an offense necessarily included" in the offense charged. Second degree burglary is a lesser included offense of second degree burglary while armed since all of the elements of the lesser offense are also elements of the greater offense. *See* Crosby v. United States, 119 U.S.App.D.C. 244, 245, 339 F.2d 743, 744 (1964); Kelly v. United States,

125 U.S.App.D.C. 205, 370 F.2d 227 (1966). The court below provided the jury with the options of finding Carter guilty of the lesser or greater offense. Our ruling as to the insufficiency of the evidence relates only to the jury finding that Carter was armed. The jury has found all necessary elements for conviction of second degree burglary. We remand on other grounds, so, as above indicated, while Carter may not be tried again for burglary while armed, the charge of burglary may be reasserted. *Cf.* United States v. Ciongoli, 358 F.2d 439 (3d Cir. 1966), wherein the Court of Appeals for the Third Circuit held that where a defendant is convicted of the greater offense under a statute, but the court is persuaded that there is not sufficient proof of the commission of the greater offense and that the defendant is guilty only of the lesser offense, the conviction may stand; but the sentence is to be in line with that permitted for the lesser included offense. *See also* Robinson v. United States, 333 F.2d 323 (8th Cir. 1964); United States v. Wilson, 284 F.2d 407 (4th Cir. 1960).

dence was insufficient to show that he was ever "found" in possession of the stolen weapons; alternatively, he argues that the evidence does not establish sufficiently that his alleged possession of the weapons was "exclusive". This court considered the requirement that a defendant's possession be "exclusive" in United States v. Johnson.[57] As there noted, many, but not all, of the decisions in this Circuit which have referred to the inference instruction under consideration have used the word "exclusive" to describe the *quality* of possession prerequisite to its use, explaining that the exclusivity requirement "is no more than judicial shorthand for the underlying concept that the accused must bear a distinctive relationship to the property before the inference is allowed", and that this requirement may be met, even if the stolen property is not subject to the direct physical control of the accused nor located on premises under his dominion.[58] In *Johnson,* the court explicitly declared that the requirement of exclusive possession may be satisfied by somewhat less evidence than traditional concepts of possession might require in other legal contexts. Taking into account this lesser standard, the jury's finding of exclusivity of possession was permissible, under the circumstances shown by the evidence in this case.

In most cases in this Circuit in which the questioned instruction was given, the defendant was "found" in possession, in the sense that, when a search was conducted, there were stolen goods on his person or premises. But actual seizure of the property from the defendant is not an absolute requirement.[59] In the present case, appellant Carter's possession of the property was established by testimony, not by seizure. Though appellant questions the credibility of the witnesses, the jury was entitled to believe their statements; and viewing the evidence in the light most favorable to the government, Glasser v. United States, *supra,* the jury finding of possession is supported by the facts.

#### D. *Alleged Denial of Due Process*

Appellant Carter next asserts that the instruction under examination denied him due process as to the count alleging theft of government property, because the trial court failed to inform the jury that they must find, beyond a reasonable doubt, the existence of all elements of each charge to which the instruction pertained, even if they found him to be in exclusive possession of recently stolen property.[60] He reasons that the instruction permitted a shortcut from a finding of possession to a determination of guilt, rather than requiring a finding on each element of the particular offense being considered by the jury. This argument is similar to one advanced in United States v. Johnson, *supra,* where this court, noting that the trial court had instructed on the presumption of innocence and the government's burden of proof on each element of the offenses charged, refused to find the instruction there given to be erroneous.

Reading the instructions given in the instant case in their entirety, we find no support for appellant Carter's contention. In addition to instructing generally on the presumption of innocence and the government's burden of proof, the trial court gave the following admonition to the jury:

The defendant's possession of the recently stolen property does not shift the burden of proof. The government always has the burden of proving be-

---

57. *See* n. 43, supra.

58. 140 U.S.App.D.C. at 58, 59, 433 F.2d at 1164, 1165.

59. *See, e. g.,* United States v. Wood, supra; Tractenberg v. United States, 53 U.S.App.D.C. 396, 293 F. 476 (1923).

60. A conviction cannot stand unless each element of the offense is supported by sufficient evidence, and speculation may not save an inadequate factual predicate. *See* United States v. Melton, supra; Bailey v. United States, 135 U.S.App.D.C. 95, 391–397, 416 F.2d 1110 (1969).

yond a reasonable doubt every essential element of the offense.

Before you may draw an inference from the defendant's unexplained or unsatisfactorily explained possession of the property, you first must find that the Government has proved beyond a reasonable doubt every essential element of the offense.

In this and other language regarding the disputed instruction, the court was closely following the model suggested by this court in Pendergrast v. United States, *supra*.

With the exception of the use of the word "crimes", which we have earlier found to be erroneous, the trial court's instruction was without fault, insofar as it pertained to the charge of theft of government property. However, as will be shown, the "doodle" evidence, which was offered to show appellant Carter's presence at the scene of the burglary, was erroneously admitted into evidence against him. We can only speculate whether it was this evidence, the permissible inference, or a combination of both, which lead to the jury's verdict. Consequently, the conviction on this count must be reversed and remanded.

To summarize, we have found the following in regard to the questioned trial court instruction: (1) the instruction was erroneously extended to include the three counts pertaining to the Molotov cocktail; (2) without benefit of the inferences authorized by the instruction, there was insufficient evidence to sustain appellant Carter's conviction on these three counts; and (3) the instruction did not deny appellant Carter due process in regard to his conviction for theft of government property. We have further found that the trial court should have granted the motion for judgment of acquittal based on the insufficiency of the evidence, to the extent heretofore indicated.

### E. The "Doodle" Evidence

Early in the trial, the court admitted into evidence certain photographs depicting the arms room shortly after the commission of the burglary. These photographs were ostensibly offered to portray the scene and to establish that a burglary had taken place; appellant Carter, therefore, offered no objection. One of the exhibits was a photograph of a desk pad, which lay on a desk in the arms room at the time of the burglary. A face was drawn on the desk pad; below the face, the following hand printed sentence appeared: "King Kong is Black". Both the face and the printing were depicted in the photograph. During the course of the trial, appellant Carter occupied himself by producing "doodles", which included drawings of a number of faces. After the defense rested, the Assistant U. S. Attorney prosecuting the case moved that the "doodles" be turned over to the government, for comparison with the desk pad drawing. Over objection by the defense, the trial court ordered appellant Carter to produce the "doodles".

A special agent of the F.B.I., testifying the next day, stated that there had been insufficient time for expert analysis of these drawings. He conceded that he was told by "older, more experienced" agents that there were not enough definitive markings or points of identity to effect a valid comparison of the photographed drawing and the "doodles". Nevertheless, again over defense objection, the "doodle" drawings made by appellant Carter were received into evidence. The jury was thus given the opportunity to compare these drawings with the face depicted in the photograph of the desk pad.

At the trial and before this court, the government asserted that the drawings were admissible under 28 U.S.C. § 1731.[61] We find that statute to

---

61. The statute reads:
 The admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person.

In Hickory v. United States, 151 U.S. 303, 305, 14 S.Ct. 334, 38 L.Ed. 170 (1894), the Court held the genuineness of disputed handwriting could not be determined by comparing it with other handwriting of the party unless the writ-

be inapplicable to the drawings we are here concerned with, as, by its own terms, the statute is limited to handwriting. We have not been cited to any cases which have applied the statute to forms of expression other than words or figures, and we are not convinced that the statute should be other than strictly construed.[62]

The government next seeks to justify the admission of the "doodle" drawings on the basis of this proposition: all facts having rational probative value are admissible unless some specific rule forbids it;[63] the "doodles" were relevant, to the extent that the jurors could find similarities between them and the drawing portrayed on the desk pad and draw inferences therefrom; thus, in the absence of a prohibitive rule, the "doodles" were admissible. The government further argues that the lack of expert testimony bearing upon a comparison of the drawings under consideration merely goes to the weight of the evidence, and does not affect its admissibility.

■■■■ Ordinarily, the relevancy of evidence is within the sound discretion of the trial judge, whose ruling will not be disturbed unless an abuse is shown.[64]

The basic relevancy test is whether proffered evidence has a tendency to make the existence of a fact more or less probable than would be the case without benefit of the evidence.[65] The government's proposition assumes that the evidence was probative, and that the lay jury was capable of making the necessary comparative analysis, to determine whether the sketches in question were produced by the same individual. However, in this instance, where the government's own witness cast doubt on the possibilities for reliable expert analysis, we are of the belief that the exhibits, as offered, were not possessed of probative value;[66] hence, they should not have been received in evidence for the jury's consideration. (But this is not to say that a properly qualified expert, testifying to the use of techniques generally acceptable to the artistic or scientific communities, could not express an opinion as to whether the face shown on the desk pad was the authentic work of appellant Peterson, after comparing it with his known works.[67])

The defense had little opportunity to rebut the impact of the "doodle" exhibits, which were offered after the defense had closed.[68] Further, the jury specifi-

---

ing which was unquestioned was in evidence for some other purpose. The lower federal courts applied *Hickory* to exclude expert testimony on the theory that the expert had based his comparison on writing which was not independently relevant. Adoption of 28 U.S.C. § 1731 was a legislative reaction to those cases.

**62.** In United States v. Angelo, 153 F.2d 247 (3rd Cir. 1946), there was evidence that certain gas ration coupons had been forged. The court upheld the introduction of a genuine sheet of coupons for comparison, and referred to § 1731 with a "cf." citation, indicating the reference was by analogy and not a direct holding under the statute.

**63.** 1 Wigmore, Evidence §§ 9–10 (3d Ed. 1940).

**64.** *See, e. g.,* Hardy v. United States, 118 U.S. App.D.C. 253, 254, 335 F.2d 288 (1964).

**65.** Rule 401, Federal Rules of Evidence, 65 F.R.D. 131, 142 (1975). *See also* McCormick, Evidence Ch. 16 (2d Ed. 1972).

**66.** It is noteworthy that the desk-pad drawings in question were not themselves produced;

only a photograph of them was introduced. This further complicated the task of comparison, and could have lead to confusion.

**67.** *See* Frye v. United States, 54 U.S.App.D.C. 46, 293 F. 1013 (1923); Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637 (1962); United States v. Jackson, 138 U.S.App. D.C. 143, 425 F.2d 574 (1970); *cf.* Hahn v. Duveen, 133 Misc. 871, 234 N.Y.S. 185 (N.Y. Sup.Ct.1929). *See also* McCormick, supra, §§ 203, 205. "Any relevant conclusions which are supported by a qualified expert witness [footnote omitted] should be received unless there are other reasons for exclusion." McCormick at 491.

**68.** *Cf.* Rule 45, Uniform Rules of Evidence, which provides for exclusion of evidence found to be substantially outweighed by the risk that admission will confuse the issues, mislead the jury, or create undue surprise. *See also* Rule 403, Federal Rules of Evidence, 65 F.R.D. 131, 143 (1975), which provides for exclusion if the probative value of the evidence is substantially outweighed by such considerations.

cally requested to view these exhibits during their deliberations. While the jury could not reach a verdict as to appellant Patterson (in whose home some of the stolen property was found), it convicted appellant Carter (who was never found with any of the stolen property on his person or premises) on four counts. It is not unlikely, then, that the "doodle" evidence was a significant factor in the jury's verdict, and we find that the error in admitting it in evidence was not harmless.

## IV. CONCLUSION

Having so resolved issues raised by appellants Patterson and Carter, we find it unnecessary to go further, and we pretermit decision on other alleged grounds of error argued by these appellants.

Reversed and remanded, with instructions.

DANAHER, Senior Circuit Judge (dissenting from reversal of the conviction of Carter):

Judge Justice has written much with which I am quite in accord, but I think Carter's conviction of theft should stand. In my view, the evidence of Carter's guilt is so overwhelming that I need only set forth the salient facts applicable to the point at issue.

The burglary of the Arms Room early in the morning of June 29, 1971 was established beyond peradventure.

Government-owned M–14 rifles, shotguns, gas masks, weapons instruction manuals and other items of Government property had been stolen.

Military police making their rounds discovered that locks on the Arms Room had been cut and that a protective screen had been removed.

Officers then undertaking a survey found on a desk pad in the Arms Room a drawing [1] of a face underneath which was the legend "King Kong is Black."

As the government officers were approaching the Arms Room area, two automobiles, rapidly driven, were seen as they left the Walter Reed grounds.

Within minutes thereafter as a time schedule was constructed through evidence at trial, the appellants Carter and Patterson reached a residence at 1318 Farragut Street where they were joined by two members of the Kokayi Family.

All four men then participated in removing from a blue Falcon, often driven by Carter, the rifles and other government property which had been stolen during the Arms Room burglary.

That property thereafter was transferred into the Farragut Street residence whence, from time to time during following weeks, Carter removed rifles for distribution by him to persons not disclosed at trial.

Carter, taking the stand, denied all connection with any of the events above mentioned, indeed he sought to establish an alibi which, clearly enough, the jury rejected as its verdict demonstrates.

As the trial proceeded, Carter, seated at a table right in front of the jury, had been drawing pictures of faces which have been referred to as "doodles". The trial judge, on motion of the prosecution, ordered that those drawings be turned over to the Government and, in due course they were offered and were received in evidence.

Carter's counsel had objected, contending that the prosecution should have requested a sample of Carter's drawings during the months "prior to trial." It is understandable that the judge regarded

---

1. That drawing at trial became GX–18K and had been received without objection as had been testimony that scribblings found on the wall in the Arms Room read:

"War Pigs" or "Super War Pigs."

Carter on brief has explained to us:

That this was a "political" crime was reflected in the facts that a military arsenal was burglarized and weapons were stolen. Additionally, epithets against the military were written on the walls (Tr. 567) (GX 18–K [the drawing and the slogan found on the Arms Room desk pad]) and in fact, the slogan "King Kong is Black" is associated with black, radical movements.

that claim as specious when it was perfectly apparent that Carter's drawings were executed *during* the trial and when the Government was not on notice that Carter was to sit there drawing pictures of faces. Moreover, if, as Carter's counsel suggests, the judge could have entered a *pre-trial* order for the taking of samples of Carter's art work, it may well seem that he certainly was in position to order the production of the very samples perfected as the trial proceeded.[2]

Carter complains that the doodles had been received in evidence in rebuttal. But Carter had testified that he had taken no part whatever in the burglary. Surely receiving rebuttal evidence falls within the proper exercise of discretion by the presiding judge. United States v. Alaimo, 297 F.2d 604, 607 (CA 3, 1961), cert. denied, 369 U.S. 817, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962).

When the judge was called upon to rule, he knew that already in evidence was the picture found in the Arms Room with its "King Kong is Black" legend. At issue was the possibility of a comparison between that Exhibit GX–18K and Carter's drawings as prepared in the presence of the jury. Their authenticity and attribution to Carter had become clear beyond question. Undoubtedly the trial judge was well aware of our recognition that a "judge's assessment of admissibility is vulnerable only if the error is clear," United States v. Sutton, 138 U.S.App.D.C. 208, 426 F.2d 1202, 1207 (1969).

Judge Robinson in *Sutton, id.*, recognized that a reasonable mind might—but

was not required to—regard an ultimate conclusion as established. In short, the weight to be given in such instances is for the jury which is considering a comparison of items of form and content of physical evidence.

So it was that the district judge overruled defense counsel's objections, as he remarked "I think the jury can take a look at it and decide one way or the other", observing further "I don't think you need an expert." [3]

Surely Carter had executed his courtroom drawings under no form of compulsion. In Holt v. United States, 218 U.S. 245, 252, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910) Mr. Justice Holmes took note of a question which "arose as to whether a blouse belonged to the prisoner." He rejected as an "extravagant extension of the Fifth Amendment" a claim that the accused had been compelled to become a witness against himself. Certainly, Mr. Justice Holmes in his long previous experience on the bench in Massachusetts would have known that it is commonplace that comparisons be made between a known physical object already in evidence, and one traceable to the accused, as where the plaster cast of a footprint found at the scene of a crime has been received for matching purposes with a defendant's shoe.

Mr. Justice Holmes clearly recognized that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral" *compulsion* to extort communications from him, not an

---

**2.** It is so that the Government purported to rely upon 28 U.S.C. § 1731, the handwriting statute, as a predicate for its offer of the doodles, but we are not here concerned with handwriting exemplars, *cf.* United States v. Ranta, 482 F.2d 1344, 1346 (8 CA 1973). Of course we are not bound by the prosecution's reliance upon a ground not applicable to the facts disclosed by the record here.

**3.** An FBI witness was given only an overnight opportunity to examine the exhibits but testified that in so short a time he had not been able to establish with definiteness a basis for certitude. Let us suppose, *arguendo*, that he

could have done so and would have so testified, could it reasonably be contended that he should not have been permitted so to state? and that the Carter doodles thereupon might not properly be received in evidence for consideration by the jury in refutation of his claim?

Where no handwriting analysis had been made but authenticity had been sufficiently demonstrated, our court noted "it is immaterial that the authenticity requirement might have been better met by another method". *See* United States v. Sutton, supra, 138 U.S. App.D.C. at 215, n.53, 426 F.2d at 1209, n.53.

exclusion of his body as evidence when it may be material. Obviously as a sheerly practical matter, he was talking about physical evidence, enunciating a principle which has found wide, indeed expanding, acceptance in criminal trials.[4]

The *Holt* opinion went on to say that the recognition of the

objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof. Moreover, we need not consider how far a court would go in compelling a man to exhibit himself. For when he is exhibited, whether voluntarily or by order, and even if the order goes too far, the evidence, if material, is competent. Adams v. New York, 192 U.S. 585, 24 Sup.Ct.Rep. 372, 48 L.Ed. 575. *See* Holt v. United States, *supra*, 218 U.S. at 253, 31 S.Ct. at 6.

Holt put on a blouse "and it fitted him", *Holt, supra*, at 252. Carter drew doodles in the courtroom.[5] They were competent evidence in possible aid of the purpose for which they were offered, depending upon what weight, if any, the jury might give to them, having in mind, *e. g.*, their characteristics, their similitude and other possible bases for comparison with GX 18–K. (See note 1, *supra*).

I find myself satisfied that there was no reversible error in the ruling which permitted the introduction in evidence of Carter's court-room "doodles".

I realize that the judge had made reference at one point to "other crimes" in the course of his charge to the jury. However, the instructions must be viewed as a whole, not in terms of some isolated reference later to be challenged. The trial judge in detail had put before the jury the elements of the various offenses charged against the several accused. I suggest, respectfully, that there was no one in that courtroom, least of all the jury, who could have failed to know precisely what issues were involved and what proof was essential to predicate a verdict beyond a reasonable doubt.[6]

The court reminded us in Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) that

a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

It goes almost without saying at this late date that in considering the suffi-

4. In different context but in furtherance of the principle to be perceived from Holt v. United States, *supra*, the Court increasingly has approved the use of physical evidence even to the extraction and chemical analysis of a defendant's blood sample. In United States v. Dionisio, 410 U.S. 1, 6, 93 S.Ct. 764, 35 L.Ed.2d 67 (quoting from Schmerber v. California, 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908) the Court said:

[B]oth federal and state courts have usually held that [the privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which

makes a suspect or accused the source of 'real or physical evidence' does not violate it.

5. *Cf.* United States v. Sutton, *supra* n.3, 138 U.S.App.D.C. at 209, 426 F.2d at 1207–1208.

6. As to Patterson, the jury returned a not guilty verdict on the substantive counts which were identical to those with which Carter had been charged. Patterson had offered substantial evidence in support of an alibi, with positive proof that at certain times covered by the indictment he had been in Texas, Mexico and Guatemala.

Incidentally, since I agree that we should reverse his conviction on a conspiracy count in No. 73–2057, we should also dismiss his appeal in United States v. Patterson, No. 74–1473, wherein he had raised a claim of prosecutorial impropriety on a point not likely to arise if he should again be tried.

ciency of the evidence following a conviction, the Government is entitled to the benefit of all reasonable inferences. United States v. Mackin, 163 U.S.App. D.C. 427, 502 F.2d 429, 441, cert. denied, 419 U.S. 1052, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974); Crawford v. United States, 126 U.S.App.D.C. 156, 375 F.2d 332 (1967).

In my view, Carter's conviction of theft, under all of the evidence so clearly establishing his guilt, should be affirmed.[7]

---

[7]. I had earlier submitted to my esteemed colleagues a proposed opinion dealing with the consolidated appeals of Carter, Patterson and Peterson. As to Peterson's appeal in No. 73–1921, I have written separately an opinion which, upon concurrence by my colleagues, will come down as a companion case coincidentally with the release of the opinion by Judge Justice.

I concur in the treatment by the latter of the claims in Carter's case insofar as he deals with the "Molotov cocktail" aspect of the counts of arson, possession of a Molotov cocktail, and second-degree burglary while armed.

I also concur in the opinion by Judge Justice and for the reasons stated, reversing the conviction of Patterson in No. 73–2057.