811 F.2d 605
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
GERVAIS EQUIPMENT CO., Plaintiff-Appellee,
v.
RUBEL AND WILSON CONTRACTORS, INC., Defendant-Appellant.
 No. 85-3760.
 United States Court of Appeals, Sixth Circuit.
 Dec. 17, 1986.
 
 Before JONES, MILBURN and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Rubel and Wilson General Contractors, Inc. ("R & W"), the defendant in this diversity breach of contract case, appeals the district court's entry of judgment in favor of the plaintiff, Gervais Equipment Co. We affirm the district court's judgment.
 
 
 2
 R & W is engaged in the business of selling various types of equipment, including drilling equipment. Gervais is engaged in the business of brokering mining and drilling equipment. In April 1981, R & W purchased two fire-damaged air compressors used for oil and gas well operations for $15,000. One of the compressors was equipped with a driver; the other had no driver. Both compressors were moved to R & W's business premises in Ohio after the purchase.
 
 
 3
 In the summer of 1981, Robert Gervais, president and sole stockholder of Gervais, travelled to R & W's place of business in Ohio for the purpose of inspecting a drilling rig that R & W had for sale. Gervais saw the two compressors during this visit. At that time, the compressor without the driver was disassembled and the other was intact. Gervais was informed that the assembled compressor had been inspected and was in working condition and that the second compressor would be operational once reassembled. No offer to buy or sell was made with respect to the compressors at this time.
 
 
 4
 In November 1981, R & W called Gervais to discuss the possible sale of some of its equipment. During this call, Gervais inquired about the two compressors and R & W offered them as a package for $17,000. Gervais accepted the offer and mailed a letter memorializing the sale to Gary Rubel, one of the equal shareholders of R & W. The letter included a $1,000 check that was a deposit on the two compressors. The letter contained a description of the compressors and an offer to pay the balance due upon delivery. Gervais also informed Rubel in the letter that he would visit R & W's place of business within two weeks to discuss the details of the sale. Rubel received the letter and deposited the $1,000 check into R & W's account.
 
 
 5
 Gervais was unable to make the November trip. At the end of the month, Rubel called him to inquire as to when he would pick up the two compressors. Gervais responded that he would pick them up shortly after Christmas. Gervais called Rubel after Christmas to make final arrangements regarding the compressors. At that time he was informed by Rubel that the equipment had been sold to another buyer on December 11, 1981. It was later revealed that R & W had in fact sold the equipment to Rubel for $15,000. Despite the broken agreement, R & W refused to return the $1,000 deposit paid by Gervais.
 
 
 6
 Gervais filed a complaint alleging breach of contract in federal district court in New York on May 6, 1982. On June 29, 1982, the complaint was transferred from New York to Ohio on R & W's motion for change of venue. The case was tried to the court on June 24, 1985. Gervais testified that the fair market value of the rebuilt compressor was between $80,000 and $95,000. He placed the value of the other compressor at approximately $40,000. He estimated that the difference between the contract price and the actual value of the equipment at the time of the transaction was between $50,000 and $60,000.
 
 
 7
 On August 15, 1985, the district court filed its findings of fact and conclusions of law, rendering judgment for Gervais against R & W for $39,000. The court held that R & W had materially breached the contract by selling the compressors to Rubel and was therefore liable to Gervais on the contract. The court found that the measure of damages for nondelivery or repudiation by the seller to be the difference between the fair market value of the goods at the time the buyer learned of the breach and the contract price of the goods. The court found that the fair market value of the equipment at the time of the breach was $55,000 and awarded Gervais $39,000. This amount represented the fair market value of the compressors at the time of breach ($55,000) minus the contract price ($17,000) plus the $1,000 deposit paid by Gervais. R & W now appeals the district court's judgment.
 
 1.
 
 8
 R & W first claims that the district court erred when it allowed Robert Gervais to express an opinion as to the market value of the two compressors. R & W claims that Gervais' opinion was not based upon facts he perceived, but instead was based on facts which he assumed to be true, but which were in fact incorrect. Specifically, R & W argues that there was no evidence upon which Gervais could base his conclusion that the compressors had been rebuilt or reassembled.
 
 
 9
 The Federal Rules of Evidence provide that: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing." Fed.R.Evid. 703. Gervais testified that he had viewed and inspected the compressors during his August 1981 visit to R & W's business premises. Gervais has been engaged in the business of brokering drilling equipment for some time. Therefore, it is reasonable to conclude that he has some expertise in the valuation of drilling equipment. Since he had inspected the compressors prior to rendering his opinion regarding their value, his opinion was indeed based on facts that he had perceived. Therefore, the district court did not err in admitting his testimony on the market value of the compressors.
 
 2.
 
 10
 R & W next claims that the district court erred in refusing to admit the deposition of an insurance adjuster who had viewed the compressors after the fire and photographs of the compressors taken at the fire site. R & W now claims that the deposition and photographs were offered for the purpose of establishing the condition and market value of the compressors at the time the parties entered into the contract. However, a review of the record indicates that at the time this evidence was proffered, it was proffered for the purpose of showing the condition of the compressors at the time R & W purchased them. It was not proffered, as R & W now asserts, to establish the condition and market value of the compressors at the time the parties entered into the contract.
 
 
 11
 The district court refused to admit this evidence after concluding that it was not relevant. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The determination of the relevancy of evidence is within the sound discretion of the trial judge, and his ruling will not be disturbed unless there is a showing of an abuse of discretion. See, e.g., United States v. Carter, 522 F.2d 666, 685 (D.C.Cir.1975).
 
 
 12
 Our review of the record establishes that the district court did not abuse its discretion in refusing to admit the deposition and photographs. The key issues before the district court were (1) whether the parties had entered into a contract, and (2) if they had, what was the value of the compressors at the time the parties entered into the contract. Evidence of the condition of the compressors and their value at the time R & W purchased them would not have been relevant to the resolution of either issue. Therefore, the district court did not abuse its discretion in excluding the deposition and the photographs.
 
 3.
 
 13
 R & W next claims that the district court erred when it found that the fair market value of the compressors was $55,000. Specifically, R & W argues that the district court erred in basing its fair market value determination on Gervais' testimony. We find no error in the district court's findings on this issue. Given Gervais' expertise in the business of brokering mining and drilling equipment, the district court was certainly justified in relying on his testimony to determine the market value of the compressors.[1]
 
 4.
 
 14
 R & W's final claim is that the district court's findings of fact were erroneous. R & W claims that there is no evidence to support the district court's finding that the compressors had been rebuilt and that R & W had agreed to deliver them in working condition. A district court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a). A district court's finding of fact will be deemed clearly erroneous on review only if, after reviewing the entire record, the appellate court "is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Additionally, when, as was the case here, "findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 1512 (1985).
 
 
 15
 A review of the record convinces us that the district court's findings of fact are not clearly erroneous. Although there was conflicting testimony as to exactly how the events at issue transpired, this alone does not impugn the district court's findings.
 
 
 16
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Although at first glance the $55,000 figure may seem exorbitant in light of the $17,000 contract price, it should be noted that there was a boom in the oil market in the early 1980's and, as a result, the value of oil equipment rose dramatically