Mrs. ANDREE HAHN, Plaintiff, *v.* Sir JOSEPH DUVEEN, Defendant.

Supreme Court, New York County, April 13, 1929.

*Frueauff, Robinson & Sloan* [*S. L. Miller* of counsel], for the plaintiff.

*Chadbourne, Stanchfield & Levy* [*Louis S. Levy* and *George W. Whiteside* of counsel], for the defendant.

BLACK, J. After the plaintiff's opening and also at the end of the plaintiff's case defendant moved to dismiss. I denied both motions and defendant duly excepted. At the end of defendant's case defendant again moved to dismiss, and upon that motion I reserved decision. I told counsel that this course would be followed to enable the court, in case the jury disagreed, to then pass upon the motion, because there was authority for the proposition that such a motion to dismiss survived a disagreement and permitted the court to decide the motion in the same way that a motion to set aside the verdict for lack of sufficient evidence could be passed upon after a jury had found for a plaintiff or defendant. This logical course of reserving decision upon a motion to dismiss, until after a verdict or failure to find a verdict, has been followed, but in a late case that very practice has been approved by the learned Appellate Division of this department. In the case of *Stock* v. *Yellow Taxi Company* Mr. Justice PHOENIX INGRAHAM reserved

decision on a motion to dismiss until after the case had gone to the jury. The jury disagreed and he afterwards granted the motion to dismiss. The case went to the Appellate Division and his decision was unanimously affirmed (222 App. Div. 804). I stated to counsel in this case that I would follow the same course of reserving decision, until after the case had been given to the jury, because it would be very unfortunate if a failure of the jury to agree should deprive the court of the same opportunity to pass upon the sufficiency of the evidence that it would have had to pass upon the same point where the jury had agreed. Neither of the counsel wished to try the case a second time and both readily agreed that the suggested course should be followed. After fourteen hours' consideration, and after every effort on the part of the court to induce the jury to agree, they finally, at five-thirteen A. M., announced that it would be impossible for them to come to the unanimous decision that the law requires before there could be a verdict. The jury was discharged and it then became my duty to pass upon the defendant's motion to dismiss, decision upon which had been reserved until after the jury should have agreed or failed to agree. The argument of the motion was most ably presented by both counsel. If there had been a verdict for either the plaintiff or defendant in this case I should not have disturbed it, because under my charge the questions were entirely questions of fact. I shall not discuss at length the law I charged at the trial applying to slander of title, because both sides agreed that in order for a plaintiff to recover she must prove that her property is what she claims it to be, because until she establishes the genuineness of her own property she cannot prove that defendant's statement regarding its spuriousness was false. While I realized that this rule might frequently cast a very heavy burden upon a plaintiff whose property was attacked, I strictly followed it in my charge and even went the full length of charging the jury that even though there had been a reckless attack upon the plaintiff's property, which may have been false, malicious and without probable cause to believe the attack was true, nevertheless plaintiff could not recover any *general* damage she might have sustained, but only such *special* damage as arose directly out of the alleged slander itself. Plaintiff Hahn claimed that her picture was an original by Leonardo da Vinci. Defendant said it was not painted by Leonardo, which was tantamount to saying that it was not an original by Leonardo and not a replica painted from the same model nor a duplicate painted from the original picture by Leonardo. There were two general contentions. Plaintiff claimed that her sacred rights of property had been invaded in that defendant

falsely and maliciously stated to a reporter of the New York *World* that the Hahn picture was not a genuine Leonardo da Vinci; that any expert who pronounced it genuine was not an expert, and that the genuine La Belle Ferroniere by Leonardo da Vinci was in the Louvre (No. 1600). Plaintiff said these statements by a man of defendant's position in the world of art, who had not seen the picture, had caused her special damage by causing the Kansas City Art Museum to call off negotiations then in progress regarding the purchase of the Hahn picture. Defendant, on the other hand, contended that the sacred right of free speech would be destroyed if such statements of opinion as he gave to the New York *World* could not be made in good faith regarding a picture that was before the public for sale and which had been the subject of newspaper articles in America and France. Thus there went to the jury the sharp issue between the rights of property and the rights of free speech. At the trial I charged the jury: " If you believe defendant's statements about plaintiff's picture were false, there (was) is nothing in the occasion alone upon which defendant's statement was made, to rebut or negative (such) inference of malice, but it is for you to say whether or not the statement was made by defendant in good faith. In so deciding you will consider the actual language of the statement itself, as well as all the rest of the evidence before you." Quoting Odgers on Libel and Slander (p. 80) I further charged the jury that " whenever a man unnecessarily intermeddles with the affairs of others, with which he is wholly unconcerned, such officious interference will be deemed malicious and he will be liable if special damage follow." I, of course, coupled with this the qualification that the " special damage must always be such as naturally or reasonably arises from the uttering of the slanderous words of the defendant." One of the first things the jury had to decide was whether or not Sir Joseph Duveen's statement that the Hahn picture was not by Leonardo da Vinci was made in good faith. Defendant, who had been put upon the stand by plaintiff as her first witness, sought to justify what he had said about the Hahn picture by stating that it could not be by Leonardo, because he knew that the genuine La Belle Ferroniere by Leonardo was in the Louvre (No. 1600). He further stated that he had " always had my (his) own opinion about it. I told you that I have never changed my mind personally about the painter of the picture, about the authorship of the picture." (Stenographer's minutes, p. 536.) " The Court: Did you know whether Leonardo painted the picture or not? The Witness (defendant): Of course, it was my opinion that he painted it. Yes, certainly, I know that he painted the picture. The Court: Did you know it? You knew it?

The Witness (defendant): Yes." (Stenographer's minutes, p. 538.) Later in the case plaintiff put in evidence the following letter, which was produced by defendant: " Messrs. Duveen Brothers, Inc., 720 Fifth Avenue, New York — Gentlemen: I have received your letter of the 20th of July, with regard to Mr. John J. Harding. I have in no way changed my opinion about the (Hahn) picture ascribed to da Vinci, of which you sent us a photograph. I am convinced that it is an old copy of the picture in the Louvre. I do not think it is contemporary, but is a little later than the Louvre picture. As for the authorship of the picture you write about, I do not know who painted it, but the Louvre picture is not passed by the most eminent connoisseurs as having been painted by Leonardo da Vinci, and I may say that I am entirely in accord with their opinion. It is suggested that the Louvre picture is very close to Leonardo da Vinci, but is not by his hand; probably it was painted by Boltraffio. I quite appreciate Mr. Harding's position in the matter. Kindly inform him, with my compliments, that I have no other reasons to give for my stand in the matter, and I do not think it is even worth while consulting with Mr. Berenson, as he is one of the experts above mentioned. Believe me, yours faithfully, Joseph Duveen." Defendant put in evidence a Paris newspaper interview by Harry Hahn, the husband of plaintiff, disclaiming at that time any contention that the No. 1600 in the Louvre was not a genuine Leonardo. It will be seen, therefore, that there was ample evidence upon which to go to the jury upon the question of the good faith of both sides. In proceeding to consider whether there was sufficient evidence before the jury to warrant a verdict, the first and, indeed, the main point is what sort of evidence the owner of a painting is required to present to a jury to prove that a painting is genuine. The law should be flexible enough to be just, and judicial methods and rules of evidence should in some measure conform to existing conditions. While we cannot take things for granted, less exactiture is sometimes required in proof now than before. A new situation exists in the world of art. Formerly the church, the state and a few powerful men owned all the fine pictures and statuary. Their experts were men who created canvasses or marbles. As some of the owners became impoverished it became necessary to sell their art treasures. Frequently, as antiques passed from family to family or from government to government, their authenticity was frequently questioned. Finally, the pendulum of artistic criticism swung slower and slower, until it usually stopped at an opinion which remained practically standard. But it was always subject to a renewal of criticism in books or in the press whenever a critic

leveled his attacks at a certain work. When wealth increased, and especially when a few men acquired great wealth, and rich men became ambitious to become owners of works of art, new methods arose whereby careful collectors could with reasonable certainty determine the authenticity of art objects. In cases where every witness, as well as the producer, was dead centuries before, the question of authenticity arose, some method of establishing authenticity other than the testimony of living witnesses was resorted to. This method was the reading of books by men who had studied the materials and methods of old painters, and taking the opinions of such experts. It happens that but few of these expert critics are themselves painters. If they were their testimony could be quickly tested by profert of their own works. Many critics frankly admit their lack of ability to paint; others state equally frankly that they are critics because it pays them better. It is far from my intention to criticise real critics, but by real critics I mean those who begin with a fact. In my charge to the jury I said upon the subject of experts: "Before charging you on the general law of the case, I wish to say a word as to expert testimony. You will be wary in accepting the conclusions of experts when such conclusions are not founded upon knowledge, experience and study. An expert is no better than his knowledge. His opinion is taken or rejected because he knows or does not know more than one who has not studied a particular subject. Assuming that he is of equal intelligence with one who has not studied or specialized in a certain subject, his opinion is better by just so much as he has intelligently considered the subject. But the opinion of some experts who have studied a subject less is better than that of others who have studied that subject more, because they are cleverer in applying what they have learned. There are two ways that experts in this case can help you with their opinions. One is by their study of the authentic history of a painting. The other by their study of the methods used or materials employed by the painters or schools of painting of the period in which it is claimed the pictures were painted. Because a man claims to be an expert, that does not make him one. You are to determine just how much of an expert a witness is, and you will determine that by his knowledge, his experience, his study and his ability to assimilate and apply this knowledge, study and experience. I warn you that in considering the criticisms by one expert of another you will apply the same rule that I have already given you regarding their conclusions; that is, that you will give them weight only as they are borne out by reasons founded on facts. * * * The ground for the admission of expert opinion evidence is necessity. The

administration of justice requires that, under proper limitations, a jury should receive the assistance of those especially qualified by experience and study to express an opinion on questions of fact relating to art, science or trade. The rule has been stated by the New York Court of Appeals as follows: ' It may be broadly stated as a general proposition that there are two classes of cases in which expert testimony is admissible. To the one class belong those cases in which the conclusions to be drawn by the jury depend upon the existence of facts which are not common knowledge and which are peculiarly within the knowledge of men whose experience or study enables them to speak with authority upon the subject. If, in such cases, the jury with all the facts before them can form a conclusion thereon, it is their sole province to do so. In the other class we find those cases in which the conclusions to be drawn from the facts stated as well as knowledge of the facts themselves depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence. In such cases not only the facts, but the conclusions to which they lead, may be testified to by qualified experts ' (*Dougherty* v. *Milliken*, 163 N. Y. 527; 57 N. E. 757; Richardson's Cases in Evidence, p. 954; editorial, New York Law Journal, March 17, 1927). * * * In all cases in which the facts can be placed before the jury by any witness, skilled or unskilled, who is capable of describing them accurately, so that a jury of average intelligence and training can understand them and form a proper conclusion based on them, expert opinion evidence is inadmissible. * * * But where the subject-matter is of such a technical nature that the proper conclusion to be drawn from the facts depend upon professional or scientific knowledge or skill, qualified experts may express their opinion as to the proper inference to be drawn from a given set of facts as an aid to the jury in reaching their own conclusion in the case before them. In *Mayor* v. *Pentz* (24 Wend. N. Y. 668) the court reasoned as follows: ' Indeed it would be more logically accurate to say that mere opinion, even of men, professional or expert, is not admissible as such; but that facts having been proved, men skilled in such matters may be admitted to prove the existence of other more general facts or laws of nature, or the course of business, as the case may be, so as to enable the jury to form an inference for themselves. Thus, the existence of certain appearances in the dead body having been proved, the chemist testifies that such appearances invariably or generally indicate the operation of some powerful chemical agent. His scientific opinion is in fact his testimony to a law of nature.' " (Richardson on Evidence, § 527, p. 387.) " Whether any subject is so far a matter of science,

art or trade, as to afford reasonable ground for belief that the jury will be aided by the opinion of an expert is a preliminary question for the trial judge. Within limits prescribed by reason, the admissibility of the judgments of experts is a matter of administration. * * * On the general subject of qualifications, it is likewise important to notice the short and satisfactory administrative rule that the mental powers and other acquired experience of a witness must be such as to make his judgment potentially helpful to the jury." (Chamberlayne Modern Law of Evidence, §§ 2375, 2382.) I have profound respect for critics whose conclusions rest upon facts. What they say should be carefully considered by a jury. The opinions of any other kinds of experts are as " sounding brass and tinkling cymbals." Some of them expound their theories largely by vocal expression and gesture; others wander into a zone of speculation founded upon nothing more tangible than " psychological correlation." I do not say that this is as absurd as it sounds to a layman, but it is too introspective and subjective to be the basis of any opinion a jury can pin its faith upon. There are also experts who admit that they have no formulas, rules or ability to produce any artistic thing, but who claim to have a sixth sense which enables some of them after they have seen a picture even for five minutes to definitely determine whether it is genuine or not. I do not say that this faculty may not be possessed by some men, but it is not based upon enough objectiveness to convey definite meaning to a jury. It does happen, though, that some or all of these experts are to-day counseling the purchase or rejection of art objects of great value. The question, therefore, arises whether their testimony is competent, how competent it is, and what its probative value is. After carefully considering the really great arguments offered by counsel in this case I am of the opinion that expert testimony of the proper sort, in connection with the other facts, is enough to have warranted a verdict in this case, and I, therefore, deny defendant's motion to dismiss. Point has been made by counsel for plaintiff in his brief that defendant by moving to dismiss because the plaintiff failed to make out his case by a fair preponderance of the credible evidence or by the greater weight of the evidence waived his right to dismiss because plaintiff had not produced *sufficient evidence*. But I do not limit my decision to such a narrow point. The point I have to decide upon this motion to dismiss is not whether the Hahn picture or the Louvre picture No. 1600 is a genuine Leonardo. The only question I have to pass upon here is whether there was sufficient evidence before the jury at the end of the defendant's case to enable the jury to render a verdict for plaintiff or defendant. Concretely put,

the real point is whether a dealer or an expert, however famous (and it is conceded that defendant is one of the greatest dealers in old paintings, although he modestly denies that he is an expert in the technical sense), can, without seeing a picture, declare that it is not the product of a certain master, and then when damages are sought for the result of a statement that plaintiff must prove is false, malicious and without probable cause, can contend that the proof of genuineness offered by plaintiff from the mouths of witnesses who have studied the admittedly genuine products of a certain master, familiarized themselves with the material upon which the picture is painted, the pigments used by the artist, his manner of treatment and every characteristic that distinguishes that master's work, is not enough to enable a jury to reach a verdict. I do not believe a defendant in such circumstances can contend that the testimony of expert witnesses is not enough to enable the jury to reach a verdict. And this is especially true, because defendant had no way other than through the statements of expert witnesses to reach the conclusions that formed the basis of his opinion given to the New York *World*, which statement is the basis of Mrs. Hahn's claim. I make these observations because defendant's memorandum refers to the case of *Jendwine* v. *Slade* (2 Esp. 572), a case decided about 1799. While the court there said: "There being no way of tracing the picture itself, it could only be matter of opinion whether the picture in question was the work of the artist whose name it bore, or not," it did after its decision, for some reason, refer the cause to arbitration. I do not know upon what evidence the arbitrators gave their decision, but the learned chancellor said this "opinion" evidence was all the evidence available. The court's opinion quoted in the *Jendwine* case was written over one hundred years before Professor Laurie wrote on Pigments and Mr. Berensen wrote on Italian paintings, and nearly one hundred years before the X-ray was developed by Professor Roentgen. I have no doubt about the competency of the proof given by expert witnesses as to the authenticity of the pictures they testified about. Its weight is another matter, and that was for the jury. The amount of importance to be attached to what the experts say depends entirely upon the factual basis for their conclusions. It required some mental agility to follow some of the experts from their positive testimony on the stand to the diametrically opposite views they had expressed in their books long before. The case thus resolved itself into a battle between experts. Plaintiff claims that her picture was the original La Belle Ferroniere painted by Leonardo da Vinci and was formerly in the Louvre Gallery in Paris, and she bases her contentions upon the testimony that the

Hahn picture is out of proportion; that it is too short at the bottom for its height at the top, which plaintiff claims shows that it was cut off at the bottom. Plaintiff also claims that it contains a band of paint running from left to right at the bottom of the picture, and that this band was painted over the picture some time after it was first painted. And plaintiff claims that the X-ray shows that under this band are shadows which indicate that before the band was painted over, the picture had the rest of the arm and part of the hand which held the piece of lace, as described at page 3 in a catalogue of Engerud. In this catalogue under the subject of Leonardo da Vinci (beginning at page 2) on page 3 there is a quotation from the catalogue of Nicholas Bailly, which was published in 1709 (S. M., p. 1061). This quotation is as follows: $3^2$ (This number $3^2$ is the catalogue number of the Leonardo pictures). *A picture representing a portrait of a woman; small life-size figure, being 22 pouces (1.066 inches) high by fifteen and a half pouces wide, in gilt border (frame). Versailles, Small Gallery of the King, mentioned thus by Pere Dan (1642) at Fountainbleau, as probably forming part of the collection of Francis First (who reigned from 1515 to 1547)*; portrait of a Duchess of Mantua-Inventory of Le Brun (1683), No. 16, with this note added: " Seen in Paris the 8th of August, 1690 " (L. B.) (Le Brun). Houasse (1691) mentions it in Paris, with this note added, under date of the 29th of October, 1692, " Mr. Paillet has given a receipt for these 2 pictures, the other one was a picture by Bellini, to M. Houasse, which are in the small gallery at Versailles " (H.). Paillet mentions it at Versailles and declares it to be painted on wood (P.). In 1696 in the Gallery at Versailles (V). In 1737 (it) is still in the Versailles Gallery, where it is believed to be the portrait of Anne Boleyn (G. R.). Lepicie (1752) describes it thus: " This lady is dressed in a red bodice, with sleeves of the same color, attached with green cords; her hair is dressed short and smooth; her collar is trimmed with a cord; she holds a piece of mesh lace and her forehead is encircled by a black cord with a diamond in the centre. The figure has before her a stone support," mentioned in the salon of the director of buildings at the Hotel of the Surintendance (superintendent's office) by Jeaurat (1760) (J) and by du Rameau (1784); the latter identifies it with Anne Boleyn and declares it to be in " good condition " (D. R.). Engeraud's note in the catalogue says that there is now actually in the Louvre Gallery, number 1600, heights o. m. 62, width o. m. 44. The various catalogues of the Louvre putting a faulty construction on Bailly's text had confused this portrait (the Hahn portrait) with that of La Belle Ferroniere. M. Durrieu has rectified this error;

it is presumed that this portrait (the picture now in the Louvre) is that of Lucretia Crivelli, mistress of Louis Le More (S. M., pp. 1060-1-2-3). Defendant's witnesses insist that the X-rays of the Hahn picture do not sustain the plaintiff's contentions that it is the picture referred to in the Lepecie catalogue. There was much X-ray evidence regarding the picture number 1600 of the Louvre. This would have had practically no importance if defendant had not said that either the Louvre picture (1600) or the Hahn picture was genuine. In other words, if the jury was satisfied that the Louvre picture was not genuine, under this statement of the defendant they might give that fact some weight as establishing the authenticity of the Hahn picture. Defendant at the trial submitted a great deal of valuable testimony from experts recognized as men of world-wide reputation upon the authenticity of the two pictures, the Hahn picture and the Louvre picture, and some very illuminating evidence upon the X-rays of the two pictures. The points I have referred to comprise but a small part of the evidence that was before the jury. I merely list them because they are some of the evidence the jury had before them when they disagreed. Much as I regret that I cannot write an opinion from which there can be an immediate appeal, so that the law may be at once finally fixed without the time and expense of another trial, I am constrained to hold that there was sufficient evidence before the jury to enable them to render a verdict. Indeed, it took them fourteen hours to finally decide that they could not unanimously agree. Even a cursory reading of the record shows the close attention they gave the case, and the highly intelligent questions they asked the experts. To the lay mind, which often resents any verdict that does not accord with opinions they have formed with or without hearing the facts of a case, and which resents the failure of twelve certain men to exactly agree on every point in a case that took nearly four weeks to try, a disagreement offers argument for the abolition of juries. But my own observation is that their verdicts are usually right. With the world's most famous experts as witnesses, and with the shortening of the case that can easily follow a second trial, it is quite possible that another jury may quickly render a verdict. Motion to dismiss is denied and case is restored to general calendar to be set for trial by stipulation, or upon motion of either party.