[890 NYS2d 16]

JOEL THOME, Appellant, v THE ALEXANDER & LOUISA CALDER FOUNDATION, Also Known as THE CALDER FOUNDATION, et al., Respondents.

First Department, December 1, 2009

**APPEARANCES OF COUNSEL**

*Richard A. Altman*, New York City, for appellant.

*Sidley Austin LLP*, New York City (*Saima S. Ahmed, Steven M. Bierman* and *Elizabeth P. Williams* of counsel), for respondents.

94

Saxe, J.

This appeal arises out of plaintiff's efforts to obtain from defendant, the Alexander & Louisa Calder Foundation, a positive response, or any response, to his submission seeking its authentication of two theatrical stage sets and related material in his possession (the Work) that he claims were the work of renowned artist Alexander Calder. It raises the question of whether a private foundation such as this has any legal obligation either to the public at large or to owners of art work to authenticate that work.

The Calder Foundation is a private foundation formed in 1988 under New York's Not-For-Profit Corporation Law. According to its 2004 tax return, the Foundation was formed for the principal purpose of "cataloguing all the works produced by the artist Alexander Calder and making his works available for public inspection in order to facilitate art education and research." Defendant Alexander S.C. Rower is the Foundation's chairman and director, and the remaining individual defendants are trustees of the Foundation. All the individual defendants are related to Alexander Calder by blood or marriage.

By mid-2007, the Foundation had documented more than 17,000 of Calder's works for publication in its catalogue raisonné, an annotated, illustrated comprehensive listing of the artist's work. "A catalogue raisonné is regarded as a definitive catalogue of the works of a particular artist; inclusion of a painting in a catalogue raisonné serves to authenticate the work, while non-inclusion suggests that the work is not genuine" (*Kirby v Wildenstein*, 784 F Supp 1112, 1113 [SD NY 1992]).

Plaintiff's complaint sets out the history and circumstances surrounding the creation of the work at issue here, and for purposes of this CPLR 3211 motion, we accept the factual recitation as true (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). In the 1930s, Alexander Calder created a stage set, which later was destroyed, for a 1936 production of Erik Satie's musical composition *Socrate*. In 1975, plaintiff, a musician, composer and conductor of contemporary music, had a conversation with composer Virgil Thomson, who directed the 1936 production of *Socrate*. The two men discussed the possibility of recreating the Calder set and mounting a new theatrical production of the piece. Thomson contacted Calder about the possibility of a revival, and Calder responded favorably.

Plaintiff asserts that when Calder came to New York from his home in France in October 1975 in connection with an exhibi-

tion of his work at the Whitney Museum, he discussed the plans for the re-creation of the set not only with plaintiff, but with a number of others, including Calder family members, two of whom are defendants in this action. The Whitney Museum was in possession of the drawings for the original 1936 theater set, and an architect was hired to prepare working plans. In July 1976 Calder's dealer brought the completed plans to Calder, who reviewed and approved them, writing on the plans, "Dear Joel I have looked at the drawings & find them OK, and think everything OK, & construction can begin when you are ready." A professor of fine arts was appointed by Calder's dealer to carry out the construction of the re-created set, and at Calder's request, to construct in addition a second set, one third smaller than the original, to fit smaller prosceniums. The two sets and a maquette—a small-scale model of the work—were then completed, at plaintiff's expense.

Calder died in November 1976, before the date that had been arranged for him to see and have his photograph taken with the completed sets, and before the production was performed. The performance was postponed; the production was successfully staged in New York a year later. Plaintiff has kept the sets and the maquette since then.

In 1997, plaintiff, in need of funds, decided to sell the Work. He submitted the necessary documentation to the Foundation for its authentication and inclusion in the Foundation's Calder catalogue raisonné. His complaint explains that without a catalogue raisonné number from the Foundation, the Work is "essentially unmarketable," since in the art world, refusal or failure to include a work in the artist's catalogue raisonné is tantamount to a determination that the work is not authentic.

On September 15, 1997, the Foundation sent plaintiff a postcard acknowledging that it had received his materials and stating that it had "everything necessary to consider these works for inclusion in the catalogue raisonné." In 1998, plaintiff alleges, further documentation on the Work was submitted to the Foundation, which the Foundation similarly acknowledged receiving; plaintiff does not elaborate on the nature of, or the need for, this additional documentation.

Plaintiff also asserts that he had a conversation with defendant Alexander S.C. Rower in November 1997, in which Rower stated that the Work would be included in the catalogue raisonné "in a manner to be determined," and the two discussed and agreed upon the descriptive wording, "given the issues

raised by its uniqueness in Calder's oeuvre." According to plaintiff, Rower stated that the main set would be described as a "recreation" and that the second, smaller set would be described as a "new catalogue creation."

However, without explanation, the Calder Foundation did not include the Work in the catalogue raisonné. Over the years since then, plaintiff has received offers for the sets, contingent on their authentication by the Foundation and the assignment to them of catalogue raisonné numbers, but he had been unable to complete the proposed sales because the Foundation has not taken that step. Indeed, according to plaintiff's affidavit, in 2005, one of the potential buyers resubmitted the set materials to the Foundation, and "people at the Foundation" told his broker/appraiser that "they had a file on the Work, but that numbers would not be issued."

By summons and complaint dated March 14, 2007, plaintiff commenced this action, seeking, inter alia, a judgment declaring the Work to be an authentic work of and by Alexander Calder; a mandatory injunction compelling the Work's inclusion in the catalogue raisonné; and damages for breach of contract, tortious interference with prospective business advantage, and product disparagement. Defendant moved to dismiss the complaint on the grounds that the complaint failed to state any cause of action and was time-barred. Further, defendants Mary Calder Rower, Sandra Calder Davidson, and Shaun Davidson moved to dismiss on the ground that, as noncompensated trustees of a qualified charitable foundation, they are immune from liability. Plaintiff cross-moved for an order converting defendants' motion to a motion for summary judgment and granting summary judgment to him, asserting that there could be "no question as to the authenticity" of the Work.

■ The motion court granted defendants' dismissal motion, and denied leave to replead. We agree with the court's dismissal of the complaint, concluding that the facts as alleged fail to state a cause of action. The allegations evoke our sympathy for plaintiff and some puzzlement at the lack of a formal response. Many, if not all, of the legal issues raised here might have been avoided had the Foundation provided plaintiff with some explanatory response to his submission. However, determination of this appeal turns on neither of those reactions. As defendants contend, and plaintiff does not dispute, it turns on whether a duty is owed to plaintiff by any of the defendants that would entitle him to any of the relief he seeks—whether based on the

Foundation's not-for-profit status, or its explicit or implicit promises or assertions, or its unique position as the sole arbiter of whether work will be included in Calder's catalogue raisonné. We discern no such duty on defendants' part, and therefore no enforceable right of plaintiff to relief against them.

While plaintiff challenges the Foundation's failure to respond *either way* to his submission, his first two causes of action, the first seeking a judgment declaring the Work to be an authentic work of and by Alexander Calder, and the second seeking a mandatory injunction compelling the Work's inclusion in the catalogue raisonné, are based upon the contention that he is absolutely entitled to the Work's authentication and its inclusion in the Calder catalogue raisonné. However, when all plaintiff's allegations are accepted as true, he has not established a right to either form of relief.

### Mandatory Injunction Compelling the Work's Inclusion in the Foundation's Catalogue Raisonné

■ Initially, we find no support for the proposition that our courts may by mandatory injunction affirmatively compel a private entity such as the Calder Foundation to include a particular work in its catalogue raisonné based solely on the court's independent finding that the work is authentic.

Catalogues raisonné are generally undertaken by a scholar who has studied the artist's work, a dealer with expertise in that artist's work, or the artist's estate, or some combination of them (*see* Michael Findlay, *The Catalogue Raisonné*, in Spencer, The Expert versus the Object: Judging Fakes and False Attributions in the Visual Arts [Ronald D. Spencer, editor], at 57 [Oxford Univ Press 2004]). While in some instances more than one such catalogue of a particular artist's work may be created, in the case of a contemporary artist whose estate owns the reproduction rights to his or her works, the estate will have the right to preclude other authorities from publishing competing catalogues raisonné of that artist's work (*see* Peter Kraus, *The Role of the Catalogue Raisonné in the Art Market*, in The Expert versus the Object, *supra* at 69). However, regardless of whether an entity owns the artist's reproduction rights and consequently the unique entitlement to publish that artist's catalogue raisonné, the creation of a catalogue raisonné is a voluntary act, and neither its issuance nor its contents are controlled by any governmental regulatory agency (*id.*). Nor is there any guarantee that the art world will accept the validity and reliability of a

catalogue raisonné; indeed, catalogues may be rejected or ignored as unreliable (*id.*). Whether the art world accepts a catalogue raisonné as a definitive listing of an artist's work is a function of the marketplace, rather than of any legal directive or requirement. As a consequence, neither the creation of such a catalogue nor its inclusion or exclusion of particular works creates any legal entitlements or obligations.

Assuming the truth of plaintiff's assertion that the Foundation has been accepted by the art world as the body to create an authoritative Calder catalogue raisonné, that fact alone does not give a court the right to dictate what the Foundation will include in that catalogue, just as no court has the authority to compel a scholarly author of a treatise on Calder to include a listing or discussion of a particular work. Unless plaintiff can establish an independent legal right to have the Work included in the catalogue, such as an enforceable contractual promise to include it, there can be no injunction mandating the Work's inclusion.

Importantly, the injunctive relief plaintiff seeks is an order compelling the authentication of the Work; he does not seek an order compelling merely a response. In any event, however, as a practical matter, plaintiff's factual allegations establish that the Foundation's non-response to his submission was in fact a rejection of the submission. At some point after the elapse of a reasonable amount of time, the failure to issue an affirmative response, and indeed the failure to include the Work in the catalogue raisonné, had to be read as a refusal to include the Work in the catalogue. Indeed, plaintiff himself asserted that after the broker/appraiser working for one of the collectors interested in purchasing the sets resubmitted the documentation to the Foundation, he was told that "they had a file on the Work, but that numbers would not be issued." Thus, it may reasonably be inferred that plaintiff received, indirectly or by inaction, the Foundation's response; he just wants a different response. However, he is not entitled to it.

### Declaration of Authenticity by the Court

■ The judgment plaintiff seeks declaring that the Work is the authentic work of Alexander Calder is also inappropriate in these circumstances.

"Authentication is the process by which art experts—academic or independent art historians, museum or collection curators, art dealers, or auction house experts—attribute a work of

visual art . . . to a particular artist" (Spencer, *Introduction,* The Expert versus the Object, *supra* at xi [emphasis omitted]). While questions of authenticity typically arise when someone asserts that a work purporting to be an original is actually a copy, they can also arise where works were created in collaboration with others and where work was subsequently altered by another, even sometimes where an alteration was prompted by an attempt at restoration (*see* Du Boff, *Controlling the Artful Con: Authentication and Regulation,* 27 Hastings LJ 973, 978-979 [1975-1976]). It may also happen that where an artist designs a work and provides a scale model to a facility such as a foundry that will construct a full-sized version from the design, if the artist dies before the full-sized work is actually constructed, the final product may not be amenable to authentication (*see Andre Emmerich Gallery, Inc. v Segre,* 1997 WL 672009, 1997 US Dist LEXIS 16899 [SD NY 1997]; *AE Liquidation Corp. v Segre,* 2000 WL 204525, 2000 US Dist LEXIS 1756 [SD NY 2000]).

"[T]he process of authentication of visual art depends chiefly on the scholarship of art experts" (Spencer, *Introduction,* The Expert versus the Object, *supra* at xi). Since art authentication involves the exercise of the expert's informed judgment, it is highly subjective, and even highly regarded and knowledgeable experts may disagree on questions of authentication (*see* Levy, *Liability of the Art Expert for Professional Malpractice,* 1991 Wis L Rev 595, 596 [1991]).

Simply put, determinations of the authenticity of art work are complex and highly subjective assertions of fact. As such, disputes concerning authenticity are particularly ill-suited to resolution by declaratory judgment. The law cannot give an art owner a clear legal right to a declaration of authenticity when such a declaration by definition will not be definitive.

Declaratory judgments are a means to establish the respective legal rights of the parties to a justiciable controversy (*see* CPLR 3001; *see generally* 43 NY Jur 2d, Declaratory Judgments §§ 4, 22). "The general purpose of the declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations" (*James v Alderton Dock Yards,* 256 NY 298, 305 [1931]; *see* Siegel, NY Prac § 436, at 738 [4th ed]). While fact issues certainly may be addressed and resolved in the context of a declaratory judgment action (*see* Siegel, NY Prac § 436, at 739, citing *Rockland Light & Power Co. v City of New York,* 289 NY

45 [1942]), the point and the purpose of the relief is to declare the respective legal rights of the parties based on a given set of facts, not to declare findings of fact. Consideration of some typical types of declaratory judgments, such as declarations regarding the validity of a foreign divorce, the applicability of an insurance policy to a claim, and the constitutionality of a statute (*see* Siegel, NY Prac § 437, at 740-741), helps illustrate both the value of declaratory judgments in appropriate circumstances and their inapplicability in the present context.

Professor Siegel has remarked that the declaratory judgment action has been employed as a way to resolve a relatively unique dispute where the plaintiff is "unable to find among the traditional kinds of action one that will enable her to bring it to court" (*see id.* at 742, citing *Kalman v Shubert*, 270 NY 375 [1936]). In *Kalman*, the plaintiff, who had composed five operettas, sought a judgment declaring that the defendant did *not* have a contractual right to perform the operettas. The issue arose because, although he had not yet performed plaintiff's operettas, the defendant claimed to have a contractual right to perform them, based on the plaintiff's written offer to enter into a contract allowing the defendant to perform the operettas upon payment of a royalty of $100 per week for each week an operetta was performed. The plaintiff contended that the offer had never been accepted, so there was no contract (270 NY at 376-377). The Court of Appeals reversed the dismissal of the action, explaining that while most forms of relief would not be available unless the defendant actually performed the works, the plaintiff needed the affirmative relief of a declaratory judgment "to quiet a disputed jural relation as to both present and prospective obligations" (*id.* at 378).

At first blush, the present case may seem similarly to call out for declaratory relief because no other form of relief seems applicable. However, the crucial difference is that, here, what plaintiff seeks is actually a finding of fact, namely a finding by the court that the Work is an authentic Calder. Not only would this be a highly unusual use of a declaratory judgment, but it would not accomplish the very purpose of the cause of action— that of resolving the parties' respective legal rights. Even if such a declaration could be said to affect plaintiff's rights, or at least have potential monetary value to him, it would have no impact at all on any rights of defendants, but would merely stand, at best, as a record that the Foundation's assessment of the Work was disputed.

Moreover, because of the procedures and processes by which our civil litigation is decided, courts are not equipped to deliver a meaningful declaration of authenticity. For such a pronouncement to have any validity in the marketplace or the art world, it would have to be supported by the level of justification sufficient to support a pronouncement by a recognized art expert with credentials in the relevant specialty. For example, in the French legal system, declarations of authenticity are reportedly made by courts, but they are based on more than a determination of which side's expert is the more credible. In addition to the parties' disputing experts, the French court appoints its own neutral expert who possesses the necessary expertise (*see* Van Kirk Reeves, *Establishing Authenticity in French Law*, in The Expert versus the Object, *supra* at 228). In contrast, in our legal system, courts have neither the education to appropriately weigh the experts' opinions nor the authority to independently gather all available appropriate information; we can only base our conclusions on the evidence the parties choose to present to us, and our findings as to a party's entitlement to relief are generally made according to a preponderance of the evidence standard. So, any declaratory judgment of authenticity a court issued would amount to a statement that the preponderance of the evidence submitted to it supported a finding that the work at issue was genuine. Even if we considered declaratory relief to be proper in this context, such a limited determination would, in any event, be of no value. Indeed, it would be similar to a mere advisory opinion.

This is not to say that courts do not address the issue of authenticity. Courts are often required to issue findings as to art works' authenticity as an element of claims, such as those brought by dissatisfied buyers, seeking money damages from sellers or appraisers, or rescission of art sales. However, in these actions, the relief awarded by the court binds only the parties to the transaction, and does not attempt to affect the art market generally. Although it is possible for a court's pronouncement regarding a work's authenticity to have an impact on the work's market value, any such impact would be an incidental effect of the decision rather than its central purpose.

Consideration of some specific cases in which issues of authenticity arose helps to frame the nature of the problems inherent in court determinations relating to authenticity.

The case of *Greenwood v Koven* (880 F Supp 186 [SD NY 1995]) describes a dispute among a buyer, a seller, and Christie's

auction house regarding the authenticity of a pastel purportedly by twentieth century French painter Georges Braque. The seller of the pastel had provided documentation that it had been purchased from the gallery that served as Braque's exclusive dealer, and two of the auction house's art experts who specialized in impressionist and modern drawing and painting and who were considered specialists on Braque concluded that the work's authenticity was unquestionable. However, shortly after the sale, the successful bidder raised questions about the pastel's authenticity, demanding written verification of the work's authenticity by a scholar. Christie's contacted the individual in France who holds the "droit moral" for Braque—the artist's heir or designee who, under French law, possesses the legal authority to authenticate which works were done by the artist (*id.* at 189). That individual informed the auction house that the pastel could not be recognized as a work by Braque and that a certificate of authenticity would not be issued. The District Court granted summary judgment requiring the seller to return the sale proceeds, rejecting the seller's claims that the auction house had acted improperly and dismissing the seller's claims against the buyer. The court itself was not called upon to decide whether the work was actually by Braque; the buyer's entitlement to rescind the sale was based on the terms of the contracts.

The buyers were not granted rescission in the case of *Greenberg Gallery, Inc. v Bauman* (817 F Supp 167 [D DC 1993], *affd* 36 F3d 127 [DC Cir 1994]), where they claimed that the seller had sold them a forgery of a Calder work, and sued on fraud and contract claims. The trial court, upon hearing the opinions of the parties' competing experts, rejected the view of the plaintiffs' expert that the work was not the authentic work, and therefore dismissed the complaint. Its conclusion was based largely on its view that the plaintiffs' expert, Klaus Perls, who had been Calder's exclusive dealer and was an acknowledged preeminent expert on Calder's work, had conducted too cursory an examination of the sculpture to warrant the adoption of his opinion that the work was inauthentic.

It is the aftermath of the *Greenberg Gallery* decision that illustrates the inability of our legal system to provide a definitive determination of authenticity such as is sought by plaintiff here. While the District Court in *Greenberg Gallery* rejected the opinion of the plaintiffs' expert, Klaus Perls, because it considered his examination of the work insufficient, the art marketplace has proved to be of a different view: As a conse-

quence of his opinion, the work's value has been assessed to be negligible (*see* Spencer, *Authentication in Court: Factors Considered and Standards Proposed*, in The Expert versus the Object, *supra* at 189).

The point is that a declaration of authenticity would not resolve plaintiff's situation, because his inability to sell the sets is a function of the marketplace. If buyers will not buy works without the Foundation's listing them in its catalogue raisonné, then the problem lies in the art world's voluntary surrender of that ultimate authority to a single entity. If it is immaterial to the art world that plaintiff has proof that the sets were built to Calder's specifications, and that Calder approved of their construction, then it will be immaterial to the art world that a court has pronounced the work "authentic." Plaintiff's problem can be solved only when buyers are willing to make their decisions based upon the Work and the unassailable facts about its creation, rather than allowing the Foundation's decisions as to what merits inclusion in its catalogue raisonné to dictate what is worthy of purchase.

We therefore conclude that, even assuming the truth of plaintiff's assertions of fact, he is not entitled to a declaration of authenticity.

## Breach of Contract

In his cause of action for breach of contract, plaintiff does not claim that the Foundation had a contractual obligation to authenticate the Work, but rather that the contractual obligation breached by the Foundation was simply to respond to his submission within a reasonable amount of time. He relies on the Foundation Web site's invitation to the public to submit applications for possible inclusion in the Calder catalogue raisonné, reasoning that that constitutes an offer to enter into a unilateral contract, which is accepted by the submission of documentation regarding a work, thereby forming a binding contract. The terms of that contract, he asserts, are that the Foundation agrees to investigate and to render, within a reasonable time, a determination as to the authenticity of any work for which documentation is submitted.

The motion court correctly concluded that these allegations fail to state a cause of action for formation and breach of a binding contract. For a contract to be created, regardless of whether it is bilateral or unilateral, "there must be a manifestation of mutual assent sufficiently definite to assure that the

parties are truly in agreement with respect to all material terms" (*Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584, 589 [1999]). For an invitation to constitute an offer, it must be plain and clear enough to establish the intended terms of the proposed contract (*Schenectady Stove Co. v Holbrook*, 101 NY 45, 48 [1885]; *S.S.I. Invs. v Korea Tungsten Min. Co.*, 80 AD2d 155, 161 [1981], *affd* 55 NY2d 934 [1982], citing 9 NY Jur, Contracts § 21). The asserted language of the Foundation Web site inviting or encouraging art owners to submit their materials for possible inclusion in the catalogue is too vague to establish the terms of a contract that would be formed by acceptance of that invitation through the act of sending in such materials. Nor does the language of the Web site manifest any intent that the Foundation will be bound by its receipt of any such submission. Similarly, the form acknowledgment sent by the Foundation to plaintiff, informing him that the Foundation received his submission, does not contain any language indicating, or reinforcing, any intent to form a binding contract.

Furthermore, plaintiff fails to allege that his submission was in response to the Web site's invitation, or indeed that the Web site even existed at the time of his submission.

Even if we agreed that the allegations make out a claim that the Foundation had a contractual obligation to explicitly respond to plaintiff's submission, we would find that the claim is untimely. Although the accrual date may be difficult to state with precision, the failure to respond occurred, and the claim therefore accrued, a reasonable time after the 1997 submission—years beyond the six-year limitations period (CPLR 213 [1]) for this contract action commenced in 2007. Nor does a subsequent identical request from the same party start the limitations period running again (*see e.g. Taggart v State Farm Mut. Auto. Ins. Co.*, 272 AD2d 222 [2000]).

## Promissory Estoppel

We also reject plaintiff's claim that his alleged conversation with Alexander S.C. Rower in November 1997 creates grounds for relief under the doctrine of promissory estoppel. Even accepting that a "clear and unambiguous promise" is made out by Rower's alleged statement that the Work would be included in the catalogue raisonné "in a manner to be determined," in which the main set would be described as a "recreation" and the second, smaller set as a "new catalogue cre-

ation" (*see 99 Realty Co. v Eikenberry*, 242 AD2d 215, 216 [1997]), neither the complaint nor plaintiff's affidavit alleges or supports an inference of detrimental reliance, another element necessary to make out a cause of action for promissory estoppel (*Emigrant Bank v UBS Real Estate Sec., Inc.*, 49 AD3d 382, 384 [2008]; *Rosenberg v Home Box Off., Inc.*, 33 AD3d 550 [2006], *lv denied* 8 NY3d 804 [2007]).

## Product Disparagement

Of all plaintiff's causes of action, the tort of product disparagement most closely describes the crux of his claims, that defendants' failure to authenticate and list the Work reflects their purposeful effort to prevent him from selling it at its true market value in order to benefit themselves.

> "[P]roduct disparagement is an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value, or quality of a product or property, and . . . the elements of a product disparagement which must be proven are: (1) falsity of the statement; (2) publication to a third person; (3) malice (express or implied); and (4) special damages" (44 NY Jur 2d, Defamation and Privacy § 273 [footnotes omitted]).

"[H]istorians trace its ancestry to the common-law tort of slander of title," which was eventually extended to apply to the disparagement of the quality of property (*see Ruder & Finn v Seaboard Sur. Co.*, 52 NY2d 663, 670 [1981]). Product disparagement has been applied in cases involving assertions that art work was inauthentic or forged (*see e.g. Kirby v Wildenstein*, 784 F Supp 1112 [SD NY 1992]; *Hahn v Duveen*, 133 Misc 871 [1929]).

In *Hahn v Duveen* (133 Misc 871 [1929]), the plaintiff was permitted to proceed with the claim against an art expert based on the expert's published assertion that a painting the plaintiff owned was not authentic; the statement had caused negotiations for the sale of the painting to be suspended and potentially affected future sale possibilities. In *Kirby v Wildenstein* (784 F Supp 1112, 1114 [1992]), a product disparagement claim was brought by a painting's owner against an art expert engaged to verify the work's authenticity, who, after examining the work, "concluded that the Painting was either 'skinned,' meaning that it had suffered the removal of paint through overcleaning, or a copy." Although it was ultimately decided that the painting

would be listed in the catalogue raisonné as authentic—with the notation that it had been damaged by an abusive restoration and cleaning—the plaintiff thereafter found that he was unable to sell the painting. While the court dismissed the product disparagement claim in *Kirby* on the pleadings, that result was due to the plaintiff's failure to plead special damages; the court did not reach the question of whether the other elements of product disparagement were made out (784 F Supp at 1114, 1117).

■ The difficulty of applying the product disparagement cause of action to the assertions made in the present case is that plaintiff here has alleged no affirmative publication of a false statement to third persons. Rather, he relies on the assertion that the defendants' actions "in refusing to authenticate the Work tend to disparage and reflect negatively on the Work and its quality, condition, and value." The contention that defendants remained silent when they should have spoken has never been held to satisfy the requirement of a statement published to a third party.

Nevertheless, as some commentators have suggested, as a practical matter, the denial of authentication is arguably indistinguishable from a direct assertion of inauthenticity. One writer has observed:

> "For persons with an interest in a work of art purportedly by a particular artist, it is naturally of importance that the work be included in that artist's catalogue raisonné. A common practice among authors and editors of catalogues raisonnés who deem a work inauthentic is to respond to an applicant for inclusion with the seemingly innocuous and ambiguous statement that the work 'will not appear in the forthcoming catalogue,' rather than directly stating that the work is not by the artist. The view among these authors and editors is that this approach will insulate them from a claim of product disparagement. It is my view that a court would decide there is little, if any, difference between the direct and indirect opinion concerning the work's authenticity. The art market clearly understands that a refusal to publish a work in a catalogue raisonné is a decision that the work is inauthentic." (*See* Spencer, *Authentication in Court: Factors Considered and Standards Proposed,* in The

Expert versus the Object, *supra* at 191 [footnote omitted].)

Another commentator has similarly remarked that

"[w]hen a catalogue concludes a work is not unauthentic [*sic*], they often do not say so directly, but rather inform the applicant that 'the work will not appear in the forthcoming catalogue.' Of course, such indirect language does nothing to mask the clear implication of the catalogue's rejection. Therefore, even when a catalogue does not expressly disclaim a work, as some do, non-publication can be 'publication' for the purpose of art disparagement." (*See* Orenstein, Comment, *Show Me the Monet: The Suitability of Product Disparagement to Art Experts,* 13 Geo Mason L Rev 905, 915 [2005] [footnotes omitted].)

There is no question that adopting this approach and treating the Foundation's non-response as a publication asserting the Work's inauthenticity to the world at large would constitute a substantial expansion of the law. Yet the fact that non-inclusion in a catalogue raisonné is understood in the art world as a conclusion that the work is not authentic (*see Kirby v Wildenstein,* 784 F Supp at 1113) tends to support the application of the cause of action in circumstances such as these.

However, we need not come to a conclusion on that point in this case because the claim must in any event fail on statute of limitations grounds.

■ The statute of limitations for product disparagement, a species of defamation and slander of title, is one year (CPLR 215 [3]; *American Fed. Group v Edelman,* 282 AD2d 279 [2001]). The claimed tortious conduct occurred by 1998, when defendants had failed to authenticate the Work and issue catalogue raisonné numbers; even if the claim did not accrue until plaintiff incurred the special damages resulting from his inability to complete the proposed sales in 2004 or 2005 because the Foundation had not authenticated the Work, it certainly had accrued by 2005, at the latest. The continued inaction by the Foundation, and plaintiff's ongoing pleas to the Foundation that it issue catalogue raisonné numbers, do not keep resetting the clock for purposes of the running of the limitations period.

### Tortious Interference

■ Plaintiff's cause of action for tortious interference with prospective business advantage was also correctly dismissed;

nor may he amend his pleading to claim in the alternative a cause of action on a theory of tortious interference with contract, since the pleaded facts do not include the existence of a valid contract between plaintiff and a third party (see *Lama Holding Co. v Smith Barney*, 88 NY2d 413, 424 [1996]). A claim for tortious interference with prospective business advantage must allege that: (a) the plaintiff had business relations with a third party; (b) the defendant interfered with those business relations; (c) the defendant acted with the sole purpose of harming the plaintiff or by using unlawful means; and (d) there was resulting injury to the business relationship (*Carvel Corp. v Noonan*, 3 NY3d 182, 189-190 [2004]; *NBT Bancorp v Fleet/Norstar Fin. Group*, 87 NY2d 614 [1996]; *Hoesten v Best*, 34 AD3d 143, 159 [2006]).

Plaintiff has not alleged any facts suggesting that defendants violated the law or undertook actions with the sole purpose of harming him; indeed, by plaintiff's own theory of the case, defendants acted with the intent of benefitting themselves. Plaintiff has also failed to allege any facts suggesting that defendants' actions were criminal or independently tortious.

■ Moreover, the tortious interference claim is barred by the three-year statute of limitations (CPLR 214 [4]; *Buller v Giorno*, 28 AD3d 258, 258-259 [2006]). The time on that claim begins to run when the defendant performs the action (or inaction) that constitutes the alleged interference. It does not commence anew each time the plaintiff is unable to enter into a contract, unless the defendant takes some further step. Accordingly, like his breach of contract claim, plaintiff's tortious interference cause of action accrued when the Foundation failed to issue the numbers for the catalogue raisonné, thus purportedly injuring plaintiff in his ability to sell the Work (see *Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 94 [1993]; *American Fed. Group*, 282 AD2d at 279). Even where, as here, the claim is based entirely on the assertion that the defendants' action (or inaction) had a negative effect on contractual relationships that plaintiff might later have had, the subsequent injuries alleged do not affect the timeliness issue (*Johnson v Nyack Hosp.*, 891 F Supp 155, 166 [SD NY 1995]).

## Officers' and Trustees' Duties

■ Plaintiff's vaguely pleaded violation of officers' and trustees' duties also fails to state grounds for relief. To the extent plaintiff relies on the assertion that the individual defendants

have a fiduciary duty to the Foundation, there is no basis in the allegations to support a claim that any of the defendants owed a fiduciary duty to *plaintiff* (*see Granat v Center Art Galleries-Hawaii, Inc.*, 1993 WL 403977, *6, 1993 US Dist LEXIS 14092, *17-18 [SD NY 1993, 91 Civ 7252], citing *Mechigian v Art Capital Corp.*, 612 F Supp 1421, 1431 [SD NY 1985]), and, absent that, plaintiff has no cause of action for the alleged breach of such a duty (*see Hyman v New York Stock Exch., Inc.*, 46 AD3d 335, 337 [2007]; *New York Pepsi-Cola Distribs. Assn. v Pepsico, Inc.*, 240 AD2d 315 [1997]). The bare allegations that the individual defendants declined to authenticate the Work in an effort to acquire the Work themselves, in breach of their duty of loyalty to the Foundation, cannot form the basis for a breach of duty claim asserted by plaintiff.

Plaintiff also confusingly claims that the individual defendants, as officers of a not-for-profit corporation that is the sole arbiter of the authenticity of purported Calder works, breached their duty to act in good faith in the discharge of their duties, by failing to examine the submitted Works and decide issues of authenticity in good faith based upon appropriate scholarly input. Here, too, the individual defendants' alleged breach of a duty plaintiff claims they owe the Foundation as its officers cannot form the basis of a claim asserted by plaintiff, and neither the Foundation's status as a not-for-profit charitable organization nor its asserted position as the sole authority for determining the authenticity of claimed Calder works alters that fact.

■ Plaintiff cites no authority for the proposition that any entity other than the Attorney General has the right to take action against a not-for-profit based upon a claimed violation of its legal obligations (*see* N-PCL 112). Neither the Foundation's tax status nor case law allowing charities unique enforcement rights for charitable subscriptions (*see I. & I. Holding Corp. v Gainsburg*, 276 NY 427, 433 [1938]; *Matter of Versailles Found. [Bank of N.Y.]*, 202 AD2d 334 [1994]) gives plaintiff any rights here. Such "privileges" as are enjoyed by charitable foundations are not accompanied, as plaintiff contends, by a general legal responsibility, enforceable by the public at large, to act at all times in the public interest and avoid actions that could appear self-serving. In the event there is proof of misconduct or bad faith on the part of the Foundation, the Attorney General may, in his discretion, take appropriate remedial action.

■ As to the claim that defendants have some kind of legal obligation arising out of the Foundation's position as the sole

recognized Calder authority—even accepting plaintiff's assertion that he has no alternative means of obtaining authentication—plaintiff has no entitlement to the relief he seeks. Having the status of the de facto sole arbiter of authenticity of an artist's work is not automatically coupled with a legal obligation to take any particular steps regarding authentication. As stated previously, legal obligations must be grounded in contractual duties, tort duties or statutory duties, none of which are established here.

 Even if the breach of officers' and trustees' duty claim were viable, it would be barred by the statute of limitations, which is six years from the date of the alleged breach (CPLR 213 [1]). Since the essence of plaintiff's claim is that the individual defendants breached their duties when they failed to cause the Foundation to issue catalogue raisonné numbers, the claim would have accrued by 1998.

## Civil Conspiracy

 In his cause of action for "civil conspiracy," plaintiff alleges that defendants engaged in a "common scheme or plan to deprive [him] of his absolute right to sell the Work." However, as the motion court stated, New York does not recognize an independent cause of action for civil conspiracy (*Zachariou v Manios*, 50 AD3d 257 [2008]; *Bronx-Lebanon Hosp. Ctr. v Wiznia*, 284 AD2d 265, 266 [2001], *lv dismissed* 97 NY2d 653 [2001]). Since none of plaintiff's tort claims are viable and timely, those claims cannot form the basis for a civil conspiracy cause of action (*see Linden v Moskowitz*, 294 AD2d 114, 115 [2002], *lv denied* 99 NY2d 505 [2003]).

## Conflict of Interest/Donnelly Act

Plaintiff suggests that the Foundation's failure to authenticate the Work as requested can only be attributed to an effort by defendants to decrease the value of the Work so that they may ultimately acquire it more cheaply. This assertion lies at the heart of the cause of action denominated "conflict of interest." Specifically, plaintiff alleges that defendants themselves own and deal in works by Calder and that they wanted to obtain the Work for themselves. In refusing to authenticate the Work, he reasons, defendants sought to manipulate the market for Calder works. On appeal, plaintiff also alleges that the cause of action is supported by General Business Law § 340 *et seq.*, known as the Donnelly Act, which is New York's antitrust statute.

A plaintiff alleging a claim under the Donnelly Act must identify the relevant product market, allege a conspiracy between two or more entities, and allege that the economic impact of that conspiracy was to restrain trade in the relevant market (*Newsday, Inc. v Fantastic Mind*, 237 AD2d 497 [1997]). Plaintiff has failed to allege either a conspiracy between two or more entities or that any such conspiracy had the economic impact of restraining trade.

Recently, in another lawsuit against an artist's foundation arising from a refusal to authenticate, claims were permitted to proceed under both the federal Sherman Act and the Donnelly Act (*see Simon-Whelan v Andy Warhol Found. for the Visual Arts, Inc.*, 2009-1 Trade Cases ¶ 76,657, 2009 WL 1457177, 2009 US Dist LEXIS 44242 [SD NY 2009, 07 Civ 6423]). The plaintiff owned a painting that was allegedly one of several made from an acetate created and chosen by Andy Warhol and that had previously been authenticated. He contended that the Andy Warhol Authentication Board, which is responsible for authenticating Warhol works, and the Andy Warhol Foundation for the Visual Arts, which publishes the Warhol catalogue raisonné, refused to authenticate the work, in furtherance of a conspiracy to artificially reduce competition in the market for Warhol works, in order to raise the value of Warhol works owned by the Warhol Foundation and to ensure that galleries and museums chose the Foundation's works.

In holding that the complaint in *Simon-Whelan* successfully stated a claim for illegal market restraint and monopolization, the District Court cited a number of alleged facts: that the Board made unsolicited suggestions to owners of Warhol works that they should submit their works for authentication; that such policies as the Board has regarding authentication were inconsistently applied; that the Board reversed prior determinations authenticating works; that the Board refused to authenticate works that the Foundation had previously attempted to purchase; and that, unlike other such boards, which are composed of well qualified and well known independent experts, the Warhol Board is made up of individuals who lack experience and who are not independent of the Warhol Foundation (2009 WL 1457177 at *5, 2009 US Dist LEXIS 44242 at *17-18).

Plaintiff's complaint here contains virtually none of the allegations that made the restraint of trade claim viable in the *Simon-Whelan* case. Rather, he relies on the assertion that the Foundation owns Calder works to infer that the Foundation

must be refusing to authenticate the Work in order to be able to purchase it at some future date for a fraction of its worth as a Calder piece. This speculative conclusion is insufficient to state a cause of action under the Donnelly Act.

■ The claim is in any event untimely. The statute of limitations for such a claim is four years (General Business Law § 340 [5]). All elements of the alleged wrongful conduct had already occurred in 1997 and 1998, when defendants declined to issue catalogue raisonné numbers, and thus, according to plaintiff, engaged in manipulation of the market. In fact, it is difficult to divine how plaintiff can argue that the cause of action accrued at a later date, since the gravamen of this cause of action is not, as plaintiff suggests on appeal, the damage he sustained when he was unable to complete a sale, but the manipulation of the market through the disparagement of the Work—disparagement that defendants communicated, according to plaintiff, by remaining silent about the Work's authenticity.

### Qualified Immunity

■ Lastly, the complaint could not proceed in any event against the individual defendants, who are entitled to qualified immunity pursuant to Not-For-Profit Corporation Law § 720-a, in view of the affidavit by the Foundation's chairman and director, Alexander S.C. Rower, establishing that they served without compensation, and because, as provided by CPLR 3211 (a) (11), there is no "reasonable probability" that their conduct constitutes gross negligence or was intended to cause harm. There is no dispute that the Foundation is a section 501 (c) (3) organization under the Internal Revenue Code (26 USC). Although Rower is not, as plaintiff notes, the chief financial officer (CFO) of the Foundation—it does not appear that the Foundation has a CFO—he is its chairman and director, and the CPLR does not require that it be the CFO who submits a letter. Rather, the CPLR states only that the evidence "may consist" of a letter from the CFO. In any event, the complaint fails to provide any specific allegations supporting the bare suggestion that the individual defendants acted with gross negligence or with an intent to harm (*see Rabushka v Marks*, 229 AD2d 899, 900 [1996]).

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered April 29, 2008, which granted defendants' motion to dismiss the complaint and denied plaintiff's cross motion for summary judgment, is deemed to be

an appeal from the judgment, same court and Justice, entered May 29, 2008 (CPLR 5501 [c]), dismissing the complaint, and so considered, said judgment should be modified, on the law, to declare, with respect to plaintiff's first cause of action, that plaintiff is not entitled to the declaration he seeks, and otherwise affirmed, without costs.

ANDRIAS, J.P., SWEENY, NARDELLI and FREEDMAN, JJ., concur.

Appeal from order, Supreme Court, New York County, entered April 29, 2008, deemed to be an appeal from the judgment, same court, entered May 29, 2008, and so considered, said judgment modified, on the law, to declare, with respect to plaintiff's first cause of action, that plaintiff is not entitled to the declaration he seeks, and otherwise affirmed, without costs.